418 P.2d 404

**Gary Peter KLAHR, Appellant,**

**v.**

**Peter WINTERBLE, Sherman Miller and Jane Doe Miller, his wife, Appellees.**

**No. 2 CA–CIV 208.**

Court of Appeals of Arizona.

Sept. 30, 1966.

Review Denied Dec. 28, 1966.

Robert J. Hirsh, Tucson, for appellant.

Lesher, Scruggs, Rucker, Kimble & Lindamood, by Thomas A. Zlaket, Tucson, for appellees.

MOLLOY, Judge.

This is an appeal from summary judgment entered against the plaintiff in a libel action. Plaintiff was a third year student at the College of Law at the University of Arizona and a duly elected member of the Student Senate of the University. This action was initiated by the plaintiff against the student editor and the faculty advisor of a publication of the associated students of the University of Arizona called the *Wildcat*.

Action was brought on the basis of an editorial which appeared in the November 8, 1963, *Wildcat*. The editorial recited:

"Senator Gary Peter Klahr, the campus demagogue, is now hissing in another pit, we see.

"His latest diatribe was at Tuesday's Senate appropriations board meeting. Klahr was elected to it last year as the final member, a gift of newly elected Student Senators who knew no better.

"Tuesday he exposed a childish threat to attempt to hamstring the Wildcat by taking away its student subsidy.

"For the reader's information, that subsidy amounts to about one-fifth of one cent per copy of the Wildcat.

"Klahr's latest demagoguery shows he means that if the Wildcat won't play ball with him and his ideas, that he wants no Wildcat.

"History proves that this is a dictator's first move. Stalin, Hitler, and Mussolini first killed the free press to substitute a lackey press of their own.

"Going along with that, Gary Peter Klahr has introduced a bill calling for a Senate Newsletter. Sound familiar? Well, he also wants to have editorial comment in that Newsletter.

"He has often claimed that he has nothing but the interests of the dear old student body at heart.

"As he did his undergraduate work at Tempe, we can hardly believe that he really means it down to the bottom of his genius.

"He has managed to confound, confuse and overwhelm other Senators, largely by his 1,000-word-a-minute delivery. Even stalwarts throw up their hands, saying, 'enough, I agree,' just to get him to stop, stop, stop.

"Some persons say that the Senator was a child prodigy.

"We have nothing against prodigies; maybe all Klahr needs is a bigger Mechano Set, but we're against buying him one.

"The worst threat that this junior-grade demagogue poses is that by his gestures and screaming, he might outlast and so disgust real Senators that student government would crash down around our ears.

"His ramblings and exhortations about the Wildcat and 'the Administration' are but a continuation of his desire to see his name bandied about as a troublemaker and a fanatic.

"Both of which he is.

"By the way, Senator Klahr, which side of the stands are you planning to sit on at the Tempe game?

"OR DO YOU WANT TO TAKE AWAY THE ATHLETIC SUBSIDY, TOO?"

Judgment was rendered for the defendants on the basis of the pleadings, depositions and the affidavits before the trial court under Rule 56(c), Rules of Civil Procedure, 16 A.R.S. Such a judgment can be rendered only when there is no genuine issue as to any material fact. When there is the "slightest doubt" as to the material facts, the litigants are entitled to a full trial. Peterson v. Valley National Bank of Phoenix, 90 Ariz. 361, 362, 368 P.2d 317 (1962).

The complaint filed herein was in two counts. The first count quoted the editorial in haec verba, as above, and alleged "[t]hat the aforesaid words are false, defamatory and libelous per se and that such words were published by the defendants maliciously, knowing them to be false and defamatory." The complaint asks for $5,000 in compensatory damages and $25,000 in punitive damages. Count II, praying for the same damage, incorporates all of the allegations of Count I and thereafter selects portions of the editorial in question as being libelous. Allegations of innuendo are made as to the portions so selected. Because of the importance of these allegations to the determinations here reached, we quote the various allegations of this portion of the complaint:

### Count II
\*     \*     \*     \*     \*     \*

### II
"That a portion of the words published, to-wit: 'Senator Gary Peter Klahr, the campus demagogue \* \* \*' conveys and intends to convey to all readers of the aforesaid publication that plaintiff is an unprincipled, factious orator who acquires influence with the populace by pandering to their prejudices or playing on their ignorance.

### III
"That a portion of the words published, to-wit: 'Senator Gary Peter Klahr, the campus demagogue, is now hissing in another pit, we see.", conveys and intends to convey to all readers of the aforesaid publication that plaintiff is on par and no better than a venomous or repulsive snake, and a person having the characteristics thereof, viz., malicious, deceitful and treacherous.

### IV
"That a portion of the words published, to-wit: 'History proves that this is a dictator's first move. Stalin, Hitler and Mussolini first killed the free press to substitute a lackey press of their own.' 'Going along with that, Gary Peter Klahr has introduced a bill calling for a Senate Newsletter. Sound familiar? Well, he also wants to have editorial comment in that Newsletter.', conveys and intends to convey to all readers of the aforesaid publication that plaintiff acts similar to and has the odious characteristics of three of the most infamous villains of all time, viz., Hitler, Stalin and Mussolini and that plaintiff's conduct is on par therewith.

### V
"That a portion of the words published, to-wit: 'We have nothing against prodigies; maybe all Klahr needs is a bigger Mechano Set, but we're against buying him one.', conveys and intends to convey to all readers of the aforesaid publication that plaintiff is immature and incompetent and conducts himself in a fashion that would not instill respect and confidence in his actions.

### VI
"That a portion of the words published, to-wit: 'The worst threat that this junior-grade demagogue poses is that by his gestures and screaming, he might outlast and so disgust real Senators that student government would crash down around our ears.', conveys and intends to convey to all readers of the aforesaid publication that plaintiff is an unprincipled factious orator of low caliber and acts in manner disgusting and obnoxious to other people.

### VII
"That a portion of the words published, to-wit: 'His ramblings and exhortations about the Wildcat and "the Administration" are but a continuation of his desire to see his name bandied about as a troublemaker and a fanatic.', 'Both of which he is.', conveys and intends to convey to all readers of the aforesaid publication that plaintiff is a bigoted individual who indulges in wild and extravagant notions causing grief, affliction, annoyance and pain to others."

In ruling upon the motion for summary judgment, the trial court had before it the depositions of the student who was the president of the student body at the University of Arizona at the time of the publication in question and of two student members of the staff of the *Wildcat*. In addition, the court had the answers submitted by the defendants to interrogatories propounded to them by the plaintiff under Rule 33, Rules of Civil Procedure, and the affidavits of the plaintiff and the defendants which were submitted in connection with the motion for summary judgment and the opposition filed thereto.

The defendants in support of their motion submitted duplicate affidavits which read as follows:

＊　　＊　　＊　　＊　　＊　　＊

"That at the time of publishing said editorial, he truly and honestly believed the content thereof to be true; and further, that he still does believe it to be true;

"That this belief was based upon familiarity with the activities of the plaintiff, Gary Peter Klahr, as a student senator;

"That the affiant was well enough acquainted with the activities of Gary Peter Klahr, as a student senator, to have formed a good-faith belief as to the honesty and truthfulness of the editorial and the statements therein; that he did, in fact, form a good-faith belief that the editorial referred to above was true and correct;

"That he did not deliberately cause the editorial to be published with knowledge that the assertions therein, or any part of them, were false; but on the contrary, with good faith that they were true."

In opposition, the plaintiff filed the following affidavit:

"GARY PETER KLAHR, being first duly sworn upon his oath, deposes and says:

"That he is the Plaintiff in the above entitled and numbered action;

"That he incorporates by reference herein as if fully set forth the Complaint which he filed in the above entitled action;

"That the allegations in his said Complaint are true of his own knowledge;

"That the said editorial entitled 'An *Editorial* "The Demagogue from Tempe'" which was published in the *Arizona Wildcat,* on or about November 8, 1963, is false in all material respects;

"That there were absolutely no grounds for the publication of said editorial or for the Defendants WINTERBLE and MILLER to believe said editorial, or any material part thereof, was true;

"That said Defendants, and each of them, knew that it was false and/or published it in reckless, wanton or malicious disregard of whether it was true or false, and in reckless, wanton or malicious disregard of the consequences to your Affiant;

"That Defendants, and each of them, did not act in good faith in publishing said editorial, but instead acted recklessly, wantonly and maliciously;

"That no factual basis existed for the charges made as published or which would or could have led said Defendants, or either of them, to believe that they were true;

"That neither of said Defendants conducted any investigation to ascertain the truth or falsity of the very serious and defamatory charges they were deliberately editorializing in the said *Arizona Wildcat;* that, in fact, Plaintiff had never even met the said Defendant MILLER prior to the publication of the said editorial;

"That said editorial was factually unfounded and a deliberate smear of your Affiant's public and private image and reputation;

"That said editorial was widely read in the State of Arizona, your Affiant's home State, and was widely read and distributed both on the University of Arizona

campus and elsewhere off the University of Arizona campus by students, professors, teachers, alumni, civic leaders, businessmen, and others; all of which severely damaged your Affiant's public and private image and reputation and further severely damaged your Affiant's prospects of a successful career in law, politics, and/or business.

"That the foregoing Affidavit is made upon your Affiant's own personal knowledge and information."

The lower court had before it, in the answers to interrogatories filed by the defendant Peter Winterble, the following statements:

"7. There are many reasons why I believe the editorial was true. Klahr had committed, and continued to commit, many errors in judgment that I, as an editorial writer, disagreed with. I sincerely felt that he was duping a large number of people with his rapid-fire technique of speaking; that he argued illogically and to his own end, and that he did not at all have the best interest of the students of the University of Arizona at heart. He was, in the strictest sense of the word, a demagogue. The dictionary defines it as 'a political leader who seeks to gain personal or partisan advantages by specious or extravagant claims, promises or charges * * * a rabble rouser.' (Webster's Third International Dictionary). Further, Webster defines 'demagoguery' as the 'oversimplified and single-minded pursuit of an inflamatory issue.' This is exactly what I maintain Klahr was doing. His handling of the issues of the campus and the issues confronting the student body (issues that he was largely responsible for initiating, I might add) was anything but circumspect, diplomatic or worthy of a student body officer.

\* \* \* \* \* \*

"14. My intent and purpose in publishing the 'article in question' was that same intent and purpose with which any newspaper editor publishes any such article: to inform the readers of the newspaper's stand for or against a particular individual; to describe his actions and statements in such a way as to leave no doubt in the reader's mind how the newspaper stands on the subject in question; and to state why the newspaper is opposed or in favor of what the person is doing. In this case, I was opposed to what Klahr was doing as a Student Senator, and I explained it in my editorial.

"15. Not being a lawyer, I cannot state 'with particularity' why I believe the article to constitute fair comment. I confined my statements in the editorial to Klahr's political actions, and told why I disagreed with them."

On appeal, the appellant contends that there are material questions of fact unforeclosed by the pleadings and verified statements before the trial court, and therefore it was error to grant the judgment below. A great portion of the briefs in this court are concerned with the question of whether the rule of libel for "public officials" as laid down in the historic decision of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is applicable to the instant case. In this decision, the Supreme Court of the United States held, for the first time, that the First and Fourteenth Amendments to the United States Constitution restrict a state in the granting of damages in a civil action of libel.

Much is said in the briefs to the effect that the government at the University of Arizona is a "play" rather than a "real" government and that obviously the *New York Times* decision has no applicability because it was dealing with "government employees." [1] Reputable authority is cited for the proposition that one is not a public official unless such an individual is invested with some part of the sovereign functions of the government. 67 C.J.S. Officers

---

1. Quote is from note 23 of the *New York Times* decision appearing at 84 S.Ct. 727.

§ 2; Tomaris v. State, 71 Ariz. 147, 224 P.2d 209 (1950); Industrial Com. v. Arizona State H. Com., 61 Ariz. 59, 145 P.2d 846 (1943); Stapleton v. Frohmiller, 53 Ariz. 11, 85 P.2d 49 (1938); Northwestern National Life Insurance Co. v. Black, 383 S.W.2d 806 (Tex.Civ.App.1964).

A reading of the *New York Times* decision, coupled with the successor decisions of Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), indicates to this court that the Supreme Court of the United States has boldly superseded state law in this area of libel and is in the process of forging its own determination of the extent to which persons in public life must accept caustic criticism without recourse to damages under state libel laws. In the *New York Times* case, the court issued a caveat as to the extent of its opinion in footnote 23 (84 S.Ct. at 727):

> "We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included."

In *Rosenblatt*, supra, the Supreme Court was dealing with whether the phrase "public official" should be extended to a supervisor of a county recreation area. The publication in question was in the form of an unpaid column in the Laconia Evening Citizen, a newspaper of general circulation in the particular area. The court said:

> "The subject matter may have been only of local interest, but at least here, where publication was addressed *primarily to the interested community,* that fact is constitutionally irrelevant. The question is squarely presented whether the 'public official' designation under *New York Times* applies." (Emphasis added.) 86 S.Ct. at 674, 675.

*Rosenblatt* specifically rejects definitions developed by states of a "public official":

> "States have developed definitions of 'public official' for local administrative purposes, not the purposes of a national constitutional protection. If existing state-law standards reflect the purposes of *New York Times,* this is at best accidental. Our decision in *New York Times,* moreover, draws its force from the constitutional protections afforded free expression. *The standards that set the scope of its principles cannot therefore be such that 'the constitutional limits of free expression in the Nation would vary with state lines.'* Pennekamp v. State of Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295." (Emphasis added.) 86 S.Ct. at 675.

The court then proceeded to say:

> "There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the 'public official' designation applies at the very least *to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.*

> "This conclusion does not ignore the important social values which underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation. But in cases like the present, there is tension between this interest and the values nurtured by the First and Fourteenth Amendments. The thrust of *New York Times* is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. Where a position in gov-

ernment has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply." (Emphasis added.) 86 S.Ct. at 675, 676.

In note 13, immediately following the above quotation in the opinion, it is stated in part:

"The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy."

Mr. Justice Douglas, concurring in *Rosenblatt,* said:

"If the term 'public official' were a constitutional term, we would be stuck with it and have to give it content. But the term is our own; and so long as we are fashioning a rule of free discussion of public issues I cannot relate it only to those who, by the Court's standard, are deemed to hold public office."

86 S.Ct. at 678

Mr. Justice Black, also concurring in *Rosenblatt,* said:

"And the right to criticize a public agent engaged in public activities cannot safely, and should not, depend upon whether or not that agent is arbitrarily labeled a 'public official.' Nor should the right to criticize depend upon how high a position in government a public agent may occupy."

86 S.Ct. at 680

In *Rosenblatt,* the court did not hold as a matter of law that the plaintiff was a "public official" under the *Times* rule, but rather indicated there was a substantial question in this regard which should have been resolved in the first instance by the trial judge:

"It is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'"

86 S.Ct. at 677

It is to be noted in *Rosenblatt* that the plaintiff was no longer a superintendent of the public recreation area in question at the time of the alleged libel, plaintiff having been discharged from his position some six months prior to the publication.

In Walker v. Courier-Journal and Louisville Times Co., 246 F.Supp. 231 (W.D.Ky. 1965), a federal district court dealt squarely with the question of extension of the *New York Times* rule:

"Thus, it can be seen that had the Plaintiff, Walker, been a 'public official' at the time of this occurrence, this Court's task would have been automatically relegated to a decision *only* of the *one issue* of whether or not the Defendants herein had published the statements attributed to them with 'actual malice', that is, with knowledge that the statements were false or with reckless disregard of whether or not they were false.

"However, the matter is not so simple, for this Court notes with significance that in laying down the doctrine of 'actual malice' in the Times case, the Supreme Court quoted with approval from the case of Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A., N.S., 361 (1908) as follows:

"'This privilege extends to a great variety of subjects and includes matters of public concern, *public men,* and candidates for office.' (Emphasis added.)

\*    \*    \*    \*    \*    \*

"I therefore reach the inescapable conclusion that the protective 'public official' doctrine of 'actual malice' announced in New York Times Co. v. Sullivan is in common reason and should be applicable to a 'public man' as well, and that the Plaintiff, Walker, was such a 'public man' under the circumstances involved here. 'Public men are, as it were, public property.'

\* \* \* \* \* \*

"Public debate cannot be 'uninhibited, robust and wide open' if the news media are compelled to stand legally in awe of error in reporting the words and actions of persons of national prominence and influence (not 'public officials') who are nevertheless voluntarily injecting themselves into matters of grave public concern attempting thereby through use of their leadership and influence, to mold public thought and opinion to their own way of thinking. If any person seeks the 'spotlight' of the stage of public prominence then he must be prepared to accept the errors of the searching beams of the glow thereof, for only in such rays can the public know what role he plays on the stage of public concern—\* \* \*." 246 F.Supp. at 233, 234.

From the foregoing it is apparent that the exact limitations of this federal libel law pertaining to "public officials" has not been established. That the Supreme Court had in mind, when formulating this new law of freedom of debate and criticism, an officer in a student government on a university campus is a debatable issue. But that it controls the criticism of all "public officials" in this state, whoever may be included in that term, is unquestioned. U.S. Const., art. VI, cl. 2.

■ We are a domestic court, and in addition to carrying out mandatory federal law, must, in the absence of legislation, adopt rules of law and equity which do justice in the circumstances. The words of Justice Alfred C. Lockwood come to mind:

"But the ultimate goal of any legal system is to do justice, and the principle that as circumstances change it is necessary to change the forms of law in order that such justice might be done was at the foundation of the English equity jurisprudence as well as of the later Roman law [as opposed to early Roman law]." Grand Int. Brotherhood of L. Engineers v. Mills, 43 Ariz. 379, at pp. 396–397, 31 P.2d 971, 978 (1934).

■ We believe the impact of the *New York Times* rule upon the libel law of the country and of this state to be such that, regardless of whether the rule be mandatory upon us in this case under the federal constitution, the rule should govern under the undisputed circumstances here.

If this were a "play" government upon the campus of the University of Arizona, then all participants in this litigation were engaged in the game. If it is "real" government, then we believe the *New York Times* rule to be mandatory, because, as we read the decision, it is not intended to be limited to the upper reaches of government. Whichever be the case, we do not conceive that it would be appropriate that there be one law of libel in this state for "public officials" off the campuses of our state universities and another law of libel be applicable to the student government officers upon such campuses, when the systems of politics and news media are so obviously patterned after the situation off campus, and when the publication is primarily addressed to the "interested community."

■ We thus address ourselves to the problem at hand under the concept that there is "\* \* \* national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 84 S.Ct. 710 at 721.

■ We note first that the editorial in question has few factual assertions. The plaintiff has filed an affidavit that the editorial in question "\* \* \* is false in all material respects \* \* \*." However, it is very apparent from reading the briefs filed in this court that it is not intended by this affidavit to deny several of the factual assertions in the editorial. For instance, in the "Statement of the

Facts" of the opening brief, it is stated that:

> "Plaintiff was a student senator, elected by the members of the Law College at the University of Arizona in the fall of 1963. He had been active in politics and student government at the U of A, and also previously in high school, and at the Arizona State University where he attended three years."

Nowhere in the statement of facts nor in the briefs filed with this court is there any denial or even suggestion of the inaccuracy of the assertion that the plaintiff had introduced a bill in the student senate for a "senate newsletter," or that the plaintiff was attempting to eliminate the subsidy received by the *Wildcat* from student funds. In the briefs there is a question raised as to whether the plaintiff wanted to have editorial comment in such a publication, but other than the general denial quoted above, there is no direct denial of such an assertion. In the deposition of one of the student staff members of the *Wildcat* there is testimony that the plaintiff had made the statement that he wanted to have editorial comment in the proposed newsletter. The other two students whose depositions were taken denied having heard the plaintiff make any such statement, but the negative testimony as to such a fact would not have probative value, there being no showing that these other witnesses were present at the time when this expression of subjective state of mind was said to have been made. Shell Oil Company v. Collar, 99 Ariz. 154, 407 P.2d 380 (1965).

Reading the complaint as a whole, and considering it in the light of the affidavits of the plaintiff, we are driven to the conclusion that the substance of the plaintiff's complaint is as stated in Count II, wherein the plaintiff selects portions of the editorial for development by allegations of innuendo. These portions of the editorial so selected fall into one of three categories: (1) name-calling, either directly ("demagogue") or by metaphor ("hissing in another pit"); (2) criticism of conduct by analogy ("History proves that this is a dictator's first move. Stalin, Hitler and Mussolini first killed the free press to substitute a lackey press of their own."); or (3) ridicule (i. e., "We have nothing against prodigies; maybe all Klahr needs is a bigger Mechano Set, but we're against buying him one.").

We note that there is no statement either directly made, or by innuendo, in the editorial in question that the plaintiff has been guilty of violation of any criminal law or of any " * * * gross immorality * * *,"[2] nor is there any attack made upon traits of character which do not have relationship to the qualifications of the plaintiff to be a student government officer and leader.

■ This court does not have before it sufficient factual background to know whether the opinions and criticisms expressed have any reasonable basis in fact and therefore, under the procedural posture of this case, must assume that they were unreasonable and in bad taste. That the editorial was written to discredit the plaintiff and deprive him of influence, prestige and possibly his office, is apparent to the casual reader.

The plaintiff has, in his affidavit and in the briefs filed in this court, strenuously attacked the "good faith" of the defendants in publishing the editorial in question and has alleged that the publication was "false" and that the defendants published it knowing it to be false or in reckless disregard of its truth. But a reading of the briefs

---

2. This is a term used in Sweeney v. Patterson, 76 U.S.App.D.C. 23, 128 F.2d 457, 458 (1942), which held:
   "Even if the italicized statements are false, appellant has stated no claim on which relief can be granted. The cases are in conflict, but in our view it is not actionable to publish erroneous and injurious statements of fact and injurious comment or opinion regarding the political conduct and views of public officials, so long as no charge of crime, corruption, gross immorality or gross incompetence is made and no special damage results."

filed in this court clearly indicates that the plaintiff acknowledges that the defendants in fact did not have a high regard for him. Appellant's arguments that the defendants had "actual malice" towards him indicate that when he challenges the "good faith" of the defendants, he is not contending that they published this editorial in bad faith in the sense that the publishers actually had a high opinion of him, but dissimulated for political or other ulterior motives. The "lack of good faith" that is being postulated by the plaintiff is that the odious analogies, the satire and the name-calling used in the editorial were not factually true and the defendants did not believe them to be factually true.

The affidavits of the opposing parties here are like sabers which cross, but do not parry. The response of the defendants affirms solemnly that the editorial was "honestly believed" and that the publishers have a "good-faith belief" that the editorial is "true and correct." And yet one is driven to the conclusion that the defendants do not contend that the plaintiff is "on par with a venomous and repulsive snake" or with Hitler, Stalin and Mussolini, as the innuendo of the plaintiff's complaint alleges.

■ Under traditional laws of libel, we do not believe that these publishers must defend factually against these allegations of innuendo, which in our view go beyond the plain meaning of the words written:

"Since the office of the innuendo is merely to explain, the authorities agree that it cannot be used to aver a fact, introduce new matter, or alter, enlarge, extend, or restrict the import of the language theretofore set out. If the words complained of are not in fact actionable, no innuendo can make them so." 33 Am.Jur., Libel and Slander, § 241, pp. 220–221; accord, 53 C.J.S. Libel and Slander § 162b(2) (b), pp. 250–253.

The natural meaning derived from the editorial in question is not that the figures of speech and invective are literally true, but that in the opinion of the writer there is some similarity as to one or more isolated characteristics. If the writer of metaphor must be prepared to prove that colorful speech is "true," in the sense that that word is used in plaintiff's affidavits, then a writer who opines that someone "barged" in where he was not wanted, would be required to prove that such person was slow, ugly, dirty and was possessed of a distasteful smell as are most barges.

If the laws of libel are this stringent a censor, then figurative and colorful speech will never be the badge of editorial writers. And perhaps this has been our law. Our Supreme Court, for instance, has defined libel as:

"'A libel is any malicious falsehood expressed by writing, printing, or by signs or pictures, which tends to bring any person into disrepute, contempt or *ridicule*, or to blacken the memory of one who is dead; or by malicious defamation expressed by writing, printing, or by signs or pictures, which tends to impeach the honesty, integrity, virtue or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt or *ridicule*.'" (Emphasis added.) Central Arizona Light & Power Co. v. Akers, 45 Ariz. 526, 535, 46 P.2d 126, 131 (1935).

We suggest this definition is so broad as to include any cartoon editorialist who might be so bold as to draw a caricature overemphasizing the size of President De-Gaulle's nose. The rule would condemn most of the political satire of Voltaire. We do not believe that this traditional definition can withstand the assault of the *New York Times* decision.

Even before *New York Times*, this jurisdiction had taken a position contrary to the majority law of this country in holding that a publication in a newspaper is privileged unless published with actual malice. Broking v. Phoenix Newspapers, 76 Ariz. 334, 264 P.2d 413, 39 A.L.R.2d 1382

(1953); Phoenix Newspapers v. Choisser, 82 Ariz. 271, 312 P.2d 150 (1957).[3]

Other previous decisions of our own Supreme Court can be pointed to in departing from traditions in the law of defamation. A landmark decision holding that mere name-calling of a public official is non-slanderous is the decision of Vinson v. O'Malley, 25 Ariz. 552, 220 P. 393, 37 A.L.R. 877 (1923). In this decision our Supreme Court quoted with approval from the Massachusetts decision of Sillars v. Collier, 151 Mass. 50, 23 N.E. 723, 6 L.R.A. 680 (1890):

"It is one of the infelicities of public life that a public officer is thus exposed to critical, and often to unjust, comments; but these, unless they pass the bounds of what the law will tolerate, must be borne for the sake of maintaining free speech. In the various cases which have been cited to us, or which have come under our observation, where, under such circumstances, actions have been maintained, the words have been considered to contain a charge of positive misconduct."

23 N.E. 723 at 724

■ We make no apology in citing a case involving the law of slander, for the Supreme Court of the United States has made it clear that there is little essential difference between freedom of speech as opposed to freedom of press. The two freedoms have been amalgamated in language such as " * * * constitutional limits of free expression * * *" (Pennekamp v. State of Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946)), "[t]he right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (citation) and freedom of inquiry, freedom of thought, and freedom to teach (citation)—and indeed the freedom of the entire university community," (Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1955)), and " * * * the right of free discussion" (Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)).

■ We believe that *New York Times* and its successor opinions cast aside reasonableness and good taste as being appropriate limitations of freedom of expression as far as "public officials" are concerned:

"I believe that the First Amendment, made applicable to the States by the Fourteenth, *protects every person from having a State* or the Federal Government fine, imprison or *assess damages against him when he has been guilty of no conduct,* see Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 688, 93 L.Ed. 834, *other than expressing an opinion, even though others may believe that his views are unwholesome, unpatriotic, stupid or dangerous."* (Emphasis added.) Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209 at 218, 13 L.Ed.2d 125 (1964)

■ While *New York Times* concerns itself only with misstatements of fact, and holds they cannot be libelous unless uttered with knowledge of their falsity or in reckless disregard of their truth, we cannot read this decision and its successor opinions without coming to the conclusion that a new charter for freedom of criticism of "public officials" has been declared. We believe that this charter includes the caustic criticism and biting ridicule exemplified by the subject editorial.

■ The appellant relies heavily upon the principle, well established in federal courts, that when an issue of fact pertains to a state of mind, the matter should not be disposed of on summary judgment. It is contended that Peterson v. Valley National Bank of Phoenix, 90 Ariz. 361, 368 P.2d 317 (1962), has adopted this federal authority

---

3. *Choisser* is one of the decisions cited by the United States Supreme Court in the *New York Times* decision in support of its holding that there was insufficient evidence before the lower court for a finding of negligence in failing to discover misstatements. (84 S.Ct. 710 at 730.)

by the citation of the decision of Alvado v. General Motors Corporation, 229 F.2d 408 (2d Cir.1955), cert. denied, 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497 (1956). We have recently discussed this line of federal authority in Reidy v. Almich, 4 Ariz.App. 144, 418 P.2d 390 (1966). There, we indicated that while we had no quarrel with these federal authorities, we do not believe that they stand for the proposition that when a state of mind is involved as an issue, summary judgment is *never* to be granted. In Reidy v. Almich, supra, we held the rule not to be applicable because the state of mind was not as to a party and, there being no substantial evidence to suggest that a signature card for a trustee account was not signed with the intent to establish a tentative trust, that judgment in favor of the tentative trust was proper on a motion for summary judgment.

We distinguish the federal decisions similar to *Alvado* on a different basis here. We have previously pointed out that there is only a general statement in the affidavit filed by the plaintiff in this action in opposition to motion for summary judgment that the editorial in question "* * * is false in *all* material respects * * *." (Emphasis added.) And yet we know from an examination of the plaintiff's brief that most of the factual assertions, omitting the innuendoes supplied by the plaintiff, are not questioned. Our Supreme Court has previously indicated that when a motion for summary judgment is filed, with appropriate supporting affidavits, the responding party may not rely upon general assertions such as made here. Wakeham v. Omega Construction Co., 96 Ariz. 336, 340, 395 P.2d 613 (1964). We conclude that there is no real issue as to the truth of the few factual assertions contained in the editorial in question. We have held that caustic criticism of a "public official" by analogy, metaphor, invective and ridicule to be non-libelous when it is unaccompanied by any charges or insinuations of criminal or grossly immoral conduct and when the publication is addressed "* * * primarily to the interested community." We are left, under this record, with no material "state of mind" at issue. When the *New York Times* doctrine renders an utterance non-libelous, "* * * actual malice * * *" becomes immaterial. Clark v. Allen, 415 Pa. 484, 204 A.2d 42, 48 (1964).

We acknowledge that we are influenced in part in arriving at the conclusion that the plaintiff's affidavit is insufficient by the nature of the case. In *New York Times* the fact that a threat of lawsuit is in itself an inexorable censor is recognized:

"The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute." 84 S.Ct. at 724.

If all actions of libel similar to this must go to a full jury trial in order to ascertain whether criticism by analogy, invective and satire is believed in "good faith" to be "true," the light of freedom of speech and press as enunciated in *New York Times* will be frustrated.

Judgment affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.