547 P.2d 1074

Julian PEAGLER and Dodge City Motors, Inc., an Arizona Corporation, Appellants,

v.

PHOENIX NEWSPAPERS, INC., an Arizona Corporation, Eugene C. Pulliam, and Albert J. Sitter, Appellees.

No. I CA–CIV 2426.

Court of Appeals of Arizona, Division 1, Department B.

March 30, 1976.

Rehearing Denied May 10, 1976.

Review Granted June 2, 1976.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Harry J. Cavanagh and Richard McC. Shannon, Phoenix, for appellants.

Snell & Wilmer by Arthur P. Greenfield, Phoenix, for appellees.

## OPINION

HAIRE, Chief Judge, Division 1.

On this appeal from a directed verdict for the defendants in a defamation action, the Court is faced with somewhat confusing problems created by changing concepts emanating from the United States Supreme Court's relatively recent broadening of first amendment freedom of speech rights as applied in defamation actions.

One of the plaintiff-appellants is Dodge City Motors, Inc., a corporation which, at the time of the publication of the alleged defamatory matter, was engaged in the business of selling new and used automobiles in Phoenix, Arizona. The other plaintiff-appellant is the president of the plaintiff corporation. The defendant-appellees include Phoenix Newspapers, Inc., the corporate owner of a newspaper, The Arizona Republic, together with its president and publisher, Eugene C. Pulliam, and a reporter-employee, Albert J. Sitter.

On August 3, 1970, an article entitled "Business bureau violates trust, ex-employes assert" was published on the front page of the Arizona Republic. The testimony shows that the article resulted from an initial visit by the defendant-reporter to the Better Business Bureau's offices to investigate a connection between the Bureau's manager and an organization known as the "Direct Sellers Association". The resulting article not only involved matters relating to the Direct Sellers Association, but also contained allegations concerning complaints which had been received by the Better Business Bureau against several of its members, including the plaintiff-corporation, Dodge City Motors. Pertinent portions of the article are quoted later in this opinion.

The basic thrust of the article concerned attempts by the Direct Sellers Association to place on a referendum some consumer legislation which had been recently passed by the Arizona legislature. The legislation involved the regulation of the direct selling of merchandise to members of the public in their homes. The Direct Sellers Association, a group of businessmen engaged in door-to-door selling, felt that certain portions of the bill were not in the public interest and had formed an association to obtain signatures on petitions in order to have the legislation placed on a referendum for popular vote. This would have effectively prohibited the legislation from becoming law 90 days after the adjournment of the legislative session. The Direct Sellers Association had been the subject of several articles published in the defendant newspaper, and the article in question was, in part, a further comment upon the activities of the Association.

The manager of the Better Business Bureau was also a director of the Direct Sellers Association. That relationship provided the basis for the reporter's connecting the Better Business Bureau to the Direct Sellers Association. The defendant-reporter's presence at the Bureau's offices concerning the Direct Sellers Association matter led to his being contacted by two former Better Business Bureau employees, and, in turn, their disclosures to him resulted in the inclusion in the published ar-

ticle of the alleged defamatory material, as follows:

"The Phoenix office of the Better Business Bureau has among its own members some business firms which engage in highly questionable sales methods, two former employes charged last week.

\*    \*    \*    \*    \*    \*

"Both said in a joint interview that they were especially disillusioned when the BBB further tarnished its record by supporting the Direct Sellers Association, formed in early July for the purpose of scuttling House Bill 102, a tough consumer protection measure.

"[The former employees] cited three firms with the longest records of unresolved consumer complaints which are allowed to remain BBB members in good standing.

\*    \*    \*    \*    \*    \*

"They were identified, in the order of frequency of complaints as Peagler's Dodge City, 1521 E. Camelback; Carpetime, 1240 E. Indian School, and Family Publication Service, 3424 N. Central.

\*    \*    \*    \*    \*    \*

"The greatest number of complaints on file against any one company, Mrs. Runser said, were lodged against Peagler's Dodge City.

"Despite the firm's frequent apparent transgressions and lack of response to complaints, no move has been made to reprimand the auto dealership, she said.

"Advised of Mrs. Runser's criticisms, White disclosed that the BBB is planning to bear down on Peagler's.

" 'I've already talked to the head of the screening committee (about Peagler's),' White said, 'who will take the matter before the board of directors in September to cancel the membership. I've already got 21 complaints written out and ready to go to the board.

\*    \*    \*    \*    \*    \*

"When originally contacted by The Arizona Republic, both Julian Peagler,

owner of the auto agency, and Bob Young, general manager, maintained that the company had not received any complaints from the BBB.

"Later, after checking with White, Peagler said that there had indeed been complaints but that they had not been brought to his or Young's attention.

" 'Now I've asked that these be sent to me personally,' Peagler said. 'Last month we sold 5,000 used and 1,600 new cars and I've been oblivious to these kinds of problems. I did not know of one sales complaint.

" 'Most complaints,' Peagler added, 'fall in the area that a used car is not satisfactorily described. But I'm not aware of any complaints that are not properly handled.' "

As we have previously stated, the subject article was published on August 30, 1970. Plaintiffs filed their complaint on October 8, 1970. At the conclusion of plaintiffs' case, the trial judge directed a verdict for the defendants, and judgment for the defendants was entered on January 15, 1973. The confusing problems which we have previously alluded to in the initial paragraph of this opinion are encountered in ascertaining the impact on this State's defamation law of several recent United States Supreme Court decisions. Our task in this regard is made more difficult by reason of significant changes in federal constitutional law which occurred subsequent to the time the trial judge entered judgment in this case, thereby rendering questionable the constitutional standard applied by him in judging the sufficiency of plaintiffs' evidence against the defendants.

The effect of the United States Supreme Court's decision in *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) on Arizona defamation law has been thoroughly discussed by the Arizona Supreme Court in *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 447 P.2d 840 (1968), and also in this Court's subsequent opinion involving

the same parties, *Phoenix Newspapers, Inc. v. Church,* 24 Ariz.App. 287, 537 P.2d 1345 (1975). Therefore the *Times* decision will not be further discussed here, except to state the basic principles which are necessary for an understanding of later United States Supreme Court decisions and the application of those decisions to the disposition made by the trial judge in this case.

The *Times* decision sets forth the following standard to be applied in defamation actions where the plaintiff is a *public official*:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 84 S.Ct. at 726.

The Court further held that the "actual malice" described above must be proved with "convincing clarity". Inasmuch as the plaintiff in the *Phoenix Newspapers, Inc. v. Church* decision, *supra,* was a public official, the failure of the trial judge to instruct the jury in accordance with the above principles necessitated a new trial after the first appeal.

Subsequent to the *Times* decision, there was considerable uncertainty as to the intended limits of the first amendment privilege therein set forth. *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) first broadened the public official concept by indicating that the federal constitutional standard was not limited to matters relating to the official conduct of the public official, but also extended to the public official's private conduct—"anything which might touch on an official's fitness for office is relevant". However, the first major expansion of the *Times* privilege occurred when the privilege afforded to "public officials", was expanded to include "public figures" in *Curtis Publishing Co. v.*

*Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1967).

On June 7, 1971, the United States Supreme Court released its decision in *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). That decision has particular importance to this appeal, since it undoubtedly formed the basis for the trial judge's determination that the *Times* privilege was applicable to the facts of this case, and that the application of that test required that he direct a verdict for the defendants. The holding of the United States Supreme Court in *Rosenbloom* expanded the *Times* privilege beyond the "public official—public figure" concept, so as to include within the scope of the privilege defamed private or "anonymous" individuals, so long as the alleged defamation also involves "matters of public or general concern".

As difficult as it might be in some cases to define the boundaries of the "public figure" concept enunciated in *Curtis Publishing Co. v. Butts, supra,* we do not have to meet that problem here. None of the parties to this appeal contend that either of the plaintiffs would come within the "public figure" concept. However, the defendants do contend that the subject matter of the alleged defamatory article was of public or general interest or concern, and thus within the expanded privilege advanced by the plurality in *Rosenbloom v. Metromedia, supra.* Assuming at this point that the publication in this case involved a matter of public or general interest or concern, if *Rosenbloom* constituted the last word on the subject we would proceed to discuss in some detail the evidence to determine its sufficiency, applying the *Times* malice standards as required by *Rosenbloom.* However, *Rosenbloom* was not the last word. Subsequent to the entry of the trial court's judgment in this case, and while this appeal was pending, the United States Supreme Court apparently decided that *Rosenbloom* had overextended the boundaries of first amendment requirements, and that a reexamination was necessary.

This reexamination found expression in the court's opinion in *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). After an extended discussion of the policy considerations underlying the *Times* extension of first amendment rights in defamation cases, the majority in *Gertz* concluded that the states:

"... should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual. The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable." 94 S.Ct. at 3010

Thus, contrary to *Rosenbloom,* the *Gertz* court refused to require, as a matter of federal constitutional law, that the *Times* privilege be extended to defamatory falsehood about a private individual (one not a public official or public figure), even though the defamatory statements might relate to matters of public or general interest or concern. Even so, the *Gertz* reassessment did not leave an entirely free hand to the states in the structuring of an applicable state standard for defamation actions involving private individuals. Rather, the court precluded any state standard which might impose liability without fault, and, in addition, limited the circumstances under which presumed or punitive damages might be allowed, stating:

"We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

\* \* \* \* \* \*

"But this countervailing state interest extends no further than compensation for actual injury. For the reasons stated below, we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of

falsity or reckless disregard for the truth." 94 S.Ct. at 3010–3011.

As we have previously stated, the trial judge was of the opinion that *Rosenbloom* required, as a matter of federal constitutional law, that he apply the *Times* privilege to the facts presented in this case. Applying that privilege, and by directing a verdict for the defendants, he found that plaintiffs had failed to show by clear and convincing evidence that the defendant had published the allegedly defamatory matter with the "actual malice" required under that test—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. Given the state of the law at the time of entry of the judgment by the trial court, we cannot criticize his decision in that regard. However, by reason of subsequent developments, his decision must now be reviewed in light of the later *Gertz* decision.

■ A strong argument could be made that under the principles announced in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) *Gertz* should not be given retroactive effect, and this case should be decided under *Rosenbloom.* However, in view of the significant changes in state defamation law mandated by *Gertz* it is our opinion that, as in *New York Times v. Sullivan, Gertz* must be given retroactive effect, at least insofar as concerns then pending appellate cases. *See Phoenix Newspapers v. Church* (Arizona Supreme Court), *supra.* Applying *Gertz,* it is apparent that the trial judge, should not have concluded that, as a matter of federal constitutional law, he was required to apply the *Times* test in determining the suffiency of plaintiff's evidence. Having arrived at this conclusion, we must now determine as a matter of state law, but within the limiting strictures enunciated in *Gertz,* the standard against which plaintiffs' evidence should have been measured.

In *Klahr v. Winterble,* 4 Ariz.App. 158, 418 P.2d 404 (1966), Judge Molloy correctly noted that even before the *Times* deci-

sion, Arizona had taken a position contrary to the majority view of the law of this country in holding that a publication in a newspaper was privileged unless published with actual malice. Although the *Times* decision in formulating its actual malice text cites an earlier Arizona decision, *Phoenix Newspapers, Inc. v. Choisser,* 82 Ariz. 271, 312 P.2d 150 (1957), as promulgating a "like rule" the *Times* actual malice test is not identical to the "actual malice" contemplated in the earlier Arizona decisions. *See Phoenix Newspapers, Inc. v. Choisser, supra; Broking v. Phoenix Newspapers,* 76 Ariz. 334, 264 P.2d 413 (1953). The *Pre-New York Times* requirements of Arizona law relating to "actual malice" were thoroughly discussed in the Arizona Supreme Court's decision in *Phoenix Newspapers, Inc. v. Church, supra.* There the Court, in referring to prior Arizona law, stated:

" 'The malice which plaintiffs must establish is not legal malice or malice at law, but it must be actual malice, malice in fact, express malice.' " 103 Ariz. at 591, 447 P.2d at 849

In the *Church* case first trial, the judge, at the request of the plaintiff, had instructed the jury:

" 'Actual malice may be inferred from the wrongful motive in the publication of the matter, if such be shown, or may be inferred from the absence of proper caution or want of proper justification for the publication of the matter, if such be shown, lack of good faith, if such be shown, or wanton or reckless disregard of the truth in publicizing the matter in the publication, if such be shown.' " 103 Ariz. at 597, 447 P.2d at 855.

It is apparent that the above-quoted instruction would have allowed the application of a negligence standard in determining the presence or absence of malice. In discussing the instruction, Justice Struckmeyer commented to the effect that, even in the absence of the questions created by the *Times* decision, the above instruction in

and of itself constituted reversible error, stating:

". . . we would still be compelled to find reversible error in the light of the appellee's requested instruction . . . ." 103 Ariz. at 600, 447 P.2d at 858.

He further stated that the defendants' requested instruction, which follows, was a correct exposition of the law as it then existed in Arizona:

" 'In this connection, you are instructed that to establish actual malice, you must find that the publication was wrongfully and intentionally published with spite or ill will towards the plaintiff, and with a desire to injure him. Mere negligence or carelessness alone is not sufficient.' " 103 Ariz. at 599, 447 P.2d at 857

Although *Gertz* would allow this jurisdiction to retreat to a negligence standard when defamation of a private individual is involved, we are of the opinion that the prior decisions of the Arizona courts in this area are sound, and that a negligence standard would be inappropriate when the alleged defamation relates to matters of public or general interest or concern. We recognize that under the principles set forth in *McKay v. Industrial Commission,* 103 Ariz. 191, 438 P.2d 757 (1968), an argument could be made that this intermediate appellate court has no choice but to apply the pre-*New York Times* Arizona law to the facts here presented. However, there have been many federal constitutional developments in the law of defamation subsequent to the promulgations of the Arizona Supreme Court decisions in this area. Substantial limitations have been imposed by *Gertz* in the area of liability and damage standards. While, as we have previously stated in this opinion, the federal decisions do not require the imposition of the *Times* actual malice test to a fact situation involving private individuals, still the federal decisions do require some modification of prior Arizona law. In considering these modifications, we deem it appropriate and not contrary to good judicial administra-

tion, to review the entire standard, making only such modification in prior Arizona decisional law as might be indicated in view of the federal constitutional developments and requirements.

The many conflicting policy considerations involved in determining a standard in this area of the law, have been exhaustively discussed in the *Rosenbloom* and *Gertz* decisions, *supra*, and, strong and convincing arguments can be made for each point of view. However, in our opinion, the qualified privilege previously adopted by the Arizona courts is the better rule, and we stand by it with those modifications which we deem necessary to effect compliance with current federal constitutional requirements. Therefore, we adopt the following as the standard against which the sufficiency of the plaintiffs' evidence must be measured:

■ Where a news media's publication involves or relates to matters of public or general interest or concern, a private individual may recover damages for alleged defamation resulting from such publication only upon a showing by clear and convincing evidence that the publication was false, and that:

(1) It was made with knowledge of its falsity or in reckless disregard of whether it was false or true, or

(2) That the publication was wrongfully and intentionally published with spite or ill will towards the plaintiff, and with a desire to injure him. Mere negligence or carelessness alone is not sufficient.

In any event, presumed or punitive damages may not be awarded in the absence of a showing that the publication was made with knowledge of its falsity or in reckless disregard of whether it was false or true.

■ The reckless disregard referred to above, also requires more than a showing of negligence. As stated by the United States Supreme Court in *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968):

". . . reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. 88 S.Ct. at 1325

*See also, Garrison v. Louisiana, supra,* which emphasized the necessity for a showing in this regard that the ". . . false statements were made with a high degree of awareness of . . . probable falsity . . . ." (85 S.Ct. at 216).

■ It has been argued that in cases involving first amendment defenses, in determining the sufficiency of the evidence to withstand a defendant's motion for directed verdict, the clear and convincing standard requires that the trial judge make an independent determination as to whether there has been a showing of actual malice, and that in making such a determination he must weigh the evidence, draw such inferences as he deems justified, and make his own determinations comparing the credibility of witnesses. See concurring opinion of Judge J. Skelly Wright in *Wasserman v. Time, Inc.,* 138 U.S.App.D.C. 7, 424 F.2d 920 (1970). In *Phoenix Newspapers, Inc. v. Church* (Court of Appeals) *supra,* we rejected that argument, holding that in a libel case, as in other cases, in ruling on a motion for directed verdict, the trial judge must examine the evidence to see whether, if all permissible inferences were drawn in plaintiffs' favor and all questions of credibility were resolved in plaintiffs' behalf the evidence then would demonstrate by clear and convincing proof that the libelous material was published with actual malice. *See Guam Federation of Teachers, Local 1581, A.F.T. v. Ysrael,* 492 F.2d 438 (9th Cir. 1974); *Alioto v. Cowles Communications, Inc.,* 519 F.2d 777 (9th Cir. 1975). In this connection the test is not that the trial judge himself must be convinced. Rather, the test merely involves a question of the degree of proof, greater than a preponderance of the evi-

dence, but less than beyond a reasonable doubt, to be applied and resolved by the trier of fact. *Stone v. Essex County Newspapers, Inc.,* Mass., 330 N.E.2d 161 (1975).

Turning now to the evidence, a prerequisite to the existence of the qualified privilege which we have discussed in this opinion is a showing that the publication related to a matter of public or general interest or concern. While in some instances this might involve a difficult determination, such is not the case here. Involving as it does the issue of consumer protection through the working of the Better Business Bureau, organized by its members to protect the public and to encourage complaints from the public concerning the commercial dealings of members of the business community with the public, it is difficult to perceive how any argument could be made that the number of consumer complaints filed with the Better Business Bureau against particular member business firms and the manner in which such complaints are handled is not a matter of public or general interest or concern.

We next consider the question of whether plaintiffs' evidence was sufficient to show that the false statement [1] was made "with knowledge of its falsity or in reckless disregard of whether it was true or false." Bearing in mind that the "reckless disregard" conduct referred to above is not measured by whether a reasonably prudent man (or reporter) would have published or would have investigated before publishing, it is our opinion that the trial judge correctly found the evidence insufficient. The thrust of plaintiffs' evidence all went to attempts to show that, in view of the fact that the defendant was dealing with former, and perhaps disgruntled, employees, he should have been more thorough in his verification of the information given. As stated in *St. Amant v.*

*Thompson, supra,* there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication. This test involves an inquiry into the subjective intent of the defendant, for as stated in *Garrison, supra,* there must be a showing that the statement was made with a "high degree of awareness of probable falsity". Recognizing that circumstantial evidence may be relied upon to show that this subjective intent existed, we find no evidence in the facts presented in the trial court from which a trier of fact could find that knowledge of falsity or reckless disregard were clearly and convincingly shown. Nor was plaintiffs' evidence sufficient to support submission to the jury on the alternative grounds of a showing that the publication was made with spite or ill will towards the plaintiffs and with a wrongful intent to injure. Again, as stated by Justice Struckmeyer in *Phoenix Newspapers v. Church, supra,* a showing of negligence or carelessness is not sufficient. Without detailing the evidence, suffice it to say that there was absolutely no evidence from which the jury could have inferred the existence of these elements on the part of the defendants. It is therefore our opinion that the evidence was insufficient to justify submission to the jury, and that, applying the standard set forth herein, the trial judge did not err in directing a verdict for the defendants.

Several other questions have been raised by plaintiffs which relate to the alleged erroneous introduction or exclusion of evidence. If we assume that the trial judge erred in these matters, a contrary ruling would have had no effect on the outcome of the case, that is, the evidence would still have been insufficient to submit to the jury. We therefore find it unnecessary to rule on these evidentiary contentions.

Questions raised in appellant's brief concerning the propriety of the trial court's

---

1. The falsity was that plaintiffs' business, rather than being the *business* with the greatest number of consumer complaints in the Bet-

ter Business Bureau files, was the *car dealer* with the greatest number of complaints in the Better Business Bureau files.

granting of summary judgment for the newspaper's managing editor, J. Edward Murray, are no longer before us, inasmuch as this Court has previously entered its order dismissing the appeal as to the defendant Murray, and that order has become final.

We would at this point terminate this opinion by affirming the trial court's judgment as to all remaining defendants, were it not for the fact that while this appeal was pending, the death of defendant-appellee, Eugene C. Pulliam, occurred and pursuant to the provisions of Rule 25(a)(2), Rules of Civil Procedure, a statement of the fact of his death was filed in these proceedings by appellees' counsel. Accompanying the statement of fact of death was a motion to dismiss the appeal as to defendant Pulliam. The motion was based upon the provisions of A.R.S. § 14–3110, which provides:

> "Every cause of action, except a cause of action for damages for . . . libel . . . shall survive the death of the person . . . liable therefor, and may be asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed."

Appellants opposed the motion to dismiss, claiming basically that the Pulliam marital community is liable for the tortious act of the defendant-husband, and that notwithstanding A.R.S. § 14–3110, this community liability survives the husband's death. Reliance is placed upon *McFadden v. Watson,* 51 Ariz. 110, 74 P.2d 1181 (1938), which held that a judgment for damages for libel entered against a husband only (the wife not having been a party to the libel action) could be enforced against community property if the tort was intended to benefit the community. However, in *McFadden,* both defendants' spouses were still alive, and the question of survival was not involved. Even so, appellants' attempt to carry this possibility of

enforcement against community property beyond the death of the tort-feasor based on *Mortensen v. Knight,* 81 Ariz. 325, 305 P.2d 463 (1956), which permitted recovery from the community property of a surviving husband for the negligence of his spouse in operating a community automobile, based on the family purpose doctrine. In other words, since that doctrine imposed liability on the husband, the liability survived the death of his wife, who was the actual tort-feasor.

In view of the express language of A.R.S. § 14–3110, excluding libel as a surviving tort, we fail to see the pertinency of the *Mortensen* decision. It is true that community tort liability may survive the death of the culpable member of that community under certain circumstances. However, here we have a non-survival statute specifically applicable to the tort of libel, which provides that the cause of action itself does not survive the death of "the person" liable therefor. The community is not that "person". In *Mortensen, supra,* the Arizona Supreme Court discarded the previously prevailing notion that the community was some type of juristic person. We therefore reject appellants' contention that a cause of action for libel survives the death of the culpable member of the community so as to allow the subsequent imposition of damages against the community property.

We further note that even if the survival statute were not applicable, we would still be compelled to grant the motion to dismiss, because plaintiffs' complaint did not join defendant Pulliam's spouse as a party, nor was there any allegation in the complaint that defendant Pulliam in committing or participating in the alleged libel was acting for and on behalf of the community. We recognize that under the law in effect at the time this case was filed the wife was not a necessary party to an action to collect a community debt created by the husband, when that debt was based upon contract, *First National Bank of Mesa v. Reeves,* 27 Ariz.

508, 234 P. 556 (1925); *Bristol v. Moser,* 55 Ariz. 185, 99 P.2d 706 (1940), and that a judgment against the husband alone could be collected from the community property. However, these principles relating to community liability for contractual debts were not applicable when community liability was premised upon a tort allegedly committed by one of the spouses. In *Garrett v. Shannon,* 13 Ariz.App. 332, 476 P.2d 538 (1970) we indicated that in order to establish community liability for a tort committed by one of the spouses, pleading and proof of that community nature was required, stating:

"The precise issue here involved is the extent of the pleading burden of a plaintiff who seeks to hold the community property liable for such a tort committed by one of the spouses. In situations involving a contract debt or other contractual obligation, it is well established by many Arizona decisions that if such debt or contractual obligation was incurred during coverture, it is presumed to be a community debt. *Donato v. Fishburn,* 90 Ariz. 210, 367 P.2d 245 (1961); *Fox v. Weissbach,* 76 Ariz. 91, 259 P.2d 258 (1953); *Rundle v. Winters,* 38 Ariz. 239, 298 P. 929 (1931); and *Cosper v. Valley Bank,* 28 Ariz. 373, 237 P. 175 (1925). This presumption is undoubtedly based upon the provisions of A.R.S. §§ 25-211, subsec. B and 25-216, subsec. B which deal with the authority of the husband to dispose of community personalty and to contract for community debts. In view of this presumption, when suing on such a debt or contractual obligation, the plaintiff need not plead the facts and circumstances showing the liability of the community property. Rather, the other party must plead the facts which would overcome the presumption. *See Henrickson v. Smith,* 111 Wash. 82, 189 P. 550 (1920). However, when liability is asserted based upon a tort committed by one of the spouses, we see no reason for such a presumption, and find no Arizona decision which holds that the presumption is available in a tort action.

In *McFadden v. Watson,* 51 Ariz. 110, 74 P.2d 1181 (1938), a case involving the question of whether the community property would be liable for libel and slander committed by the defendant-husband, the Arizona Supreme Court cited *Cosper v. Valley Bank, supra,* and reiterated that any debt incurred during coverture is presumed to be a community debt, and that the burden was upon those asserting to the contrary to prove their contention. However, we do not think that by citing *Cosper* the Arizona Supreme Court intended to infer that the presumption was available in tort cases, since it did not further discuss the presumption, but rather, proceeded to examine the evidence to see if it affirmatively showed that the tort was committed on behalf of and for the benefit of the community. The only cases which we have found expressly dealing with the availability of such presumption in a tort action hold that it is not available. *See Killingsworth v. Keen,* 89 Wash. 597, 154 P. 1096 (1916); and *Martin v. Brown,* 117 So.2d 665 (La.App.2d Cir. 1960). These cases do not provide any definitive answer insofar as concerns the application of Arizona law, since both decisions are based upon the peculiarities of the particular statutes and prior case law relating to the community property system of the jurisdictions involved. These cases do, however, provide an indication of a disposition by the courts to treat differently the questions of tort and contractual liability insofar as concerns presumptions and burdens of proof." 13 Ariz.App. at 333-334, 476 P.2d at 539

To the same effect, *see Long v. Mertz,* 2 Ariz.App. 215, 407 P.2d 404 (1965). In that case, also a libel action, the appeal was dismissed as to both spouses after the death of the husband pending appeal, on the basis of the survival statute. The court held on this point:

"Appellee Rufus Spoon died after all the briefs were filed, and proper motion to dismiss the appeal as to Rufus Spoon and Bess Spoon, his wife, was filed.

alleging that the cause of action for libel and slander was extinguished by the death of Mr. Spoon, no allegation having been made that he acted on behalf of the community. No opposition or objection was filed to this motion. We agree with the position of counsel for appellees Spoon, and therefore it is ordered dismissing this appeal with respect to appellee Rufus Spoon and Bess M. Spoon. (See Rule 4, Rules of the Supreme Court, 17 A.R.S., Sec. 14–477, Arizona revised statutes, *McLellan v. Automobile Ins. Co.,* 9 Cir., 80 F.2d 344, and *McClure v. Johnson,* 50 Ariz. 76, 69 P.2d 573, 576.)" 2 Ariz.App. at 217–218, 407 P.2d at 406

Under the 1973 amendment to the applicable community property statute, both spouses would have to be made parties (A.R.S. § 25–215), but that section did not take effect until long after the commencement of this action.

As noted earlier in this opinion, the appeal against defendant J. Edward Murray has already been dismissed. In addition, we now dismiss the appeal as to appellee Eugene C. Pulliam. As to all other defendants, the judgment entered by the trial court is affirmed.

JACOBSON, P. J., and EUBANK, J., concur.