Glen H. "Pete" WEAVER, Appellant,

v.

The PRYOR JEFFERSONIAN, a Newspaper Publishing Corp., Haskell Gaither and Haskell Lee Gaither, Appellees.

No. 46635.

Supreme Court of Oklahoma.

Sept. 20, 1977.

968

Tony Jack Lyons and Gary J. Dean, Lyons & Dean, Pryor, for appellant.

Sam P. Daniel, Jr., G. Michael Lewis, Doerner, Stuart, Saunders, Daniel & Langenkamp, Tulsa, for appellees.

SIMMS, Justice.

Appellant commenced a libel action in the court below predicated upon a "letter to the editor" printed in appellee newspaper. The alleged defamatory publication occurred while appellant was embroiled in what the parties describe as a "bitterly contested" run-off primary election for nomination to the office of Sheriff of Mayes County, Oklahoma.

Appellees moved for summary judgment after depositions had been taken and the pleadings formed. The trial judge sustained appellee's request for summary judgment for the reasons that appellant was a "public figure" within the meaning of *Curtis Publishing Company v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); and the actions of appellant alluded to in the letter published by appellees were performed or allegedly performed while the plaintiff was a "public official" within the parameters of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964).

Sustention of summary judgment additionally was predicated upon a "failure of proof that the defendants published the letter with 'actual malice'". Although the trial court's judgment found the appellees to be negligent, the court determined that the negligence did not rise to the "dignity of reckless disregard of its falsity", and the trial court found no evidence that defendants had reason to suspect the questioned letter was false.

Appeal is taken from the order sustaining motion for summary judgment.

For purposes of this appeal, appellees concede the contents of the published "letter to the editor" to be libelous per se.[1]

Appellant contends that even under the *New York Times* standard, the facts and circumstances of the case at bar raised a fact issue on the question of actual malice or alternatively, publication with reckless disregard of whether the letter was false or not. Appellant concludes the matter was not therefore subject to motion for summary judgment, but rather an issue for the trier of the facts, i. e., the jury.

In its formal order of sustention of summary judgment, the trial court recited that it had examined the files and record in the case. Those files, records, and depositions, now before this Court on appeal, reflect the following pertinent facts.

Appellant had previously served as Sheriff of Mayes County and was seeking to regain that political office by running

1. The published letter read: "Letter to the People: I've just read what Pete Weaver had to say about 'the bull being cooked up by his opponents cronies' (Daily Times, Sept. 12, 1972).

If there is anything being 'cooked up' then Pete Weaver built the fire and put the match to it by his performance while he was the Sheriff of Mayes County.

I am not 'his opponents cronies.' I'm just a taxpayer who doesn't have to take lessons about Pete Weaver because I've had it 'first handed.'

The treatment he gave my son while he was held in jail would make anyone sick. I've also got a letter in Pete Weaver's own handwriting, on his own stationery, in which he says he would 'fix' a charge which had been filed in county court, against the person he was writing

to, if this person would do him a 'favor'. Also I am ready to prove he helps himself to the personal belongings of the ones he puts in jail.

I am not afraid (even though I've been told to 'watch it') to say here in black and white that his treatment of a prisoner, is like that of Hitler's day. His handling of the other persons money is like that of an embezzler and his ability to fix charges are that of a blackmailer.

After more than 2½ years of driving several thousand miles and spending all the money I could get my hands on, I am ready to take all of this before the court, but as many of the people in Mayes county know, I am finding it rather hard to do.

But I'm not giving up because someplace there is someone who also wants to see justice served.

/s/ JEAN AVERY"

against the then incumbent Sheriff, who was the brother-in-law of Haskell Gaither, editor-publisher of the defendant weekly newspaper. Haskell Lee Gaither is the son of Haskell, and is managing editor of the *Pryor Jeffersonian.*

The evening before the Thursday publication of the paper, next preceding the Tuesday run-off election, a Jean Avery personally delivered the questioned hand-written letter to Haskell Lee Gaither at the *Jeffersonian* premises. When the letter was given to the younger Gaither, he told Jean Avery he would like his dad to go over the letter with him. Jean Avery told Haskell Lee that "I have the papers to back this up." Jean Avery left the *Jeffersonian* offices after making the quoted statement. Haskell Lee Gaither talked to his father, who "saw nothing wrong with the letter", and thereafter, Haskell Lee Gaither made some punctuation and grammatical corrections in the letter and it was published in the last edition prior to the election.

The depositions of Haskell Gaither and Haskell Lee Gaither indicated that Mrs. Avery was unknown to both. No inquiry was made of Jean Avery as to the existence or contents of the so-called "back-up papers". No reportorial inquiry was made into the alleged "fix" or "favor", nor was there any attempt made to verify or negate any of the allegations contained in the letter. No one ever contacted Pete Weaver about the letter or its allegations before the letter was published.

Other depositions presented to the court on summary judgment reflect apparent hostility of some degree between the Gaithers and Weaver's lawyer, arising prior to publication of the Avery letter. Weaver's lawyer had also represented a Barbara Pierce in divorce litigation. Barbara Pierce entered into a real estate transaction with Weaver which she later determined to be unsatisfactory. After borrowing money elsewhere to satisfy the obligation owing by her to Weaver, Barbara Pierce caused a "letter to the editor" to be written and circulated throughout Mayes County in the form of a handbill. The Pierce letter, in essence, accused Weaver and his lawyer of fraud and misrepresentation in connection with the real estate transaction.

After the Pierce letter was made public, the law partner of Weaver's attorney sent a "confidential" letter to the publishers of both the *Pryor Daily Times and the Pryor Jeffersonian.*[2]

The publishers of the *Jeffersonian* regarded the letter from the firm employed by Weaver as an attempt to muzzle, suppress, and "control" the newspaper.

Whereupon, the lawyer's letter to the newspapers was published on the front page of the *Jeffersonian* with a headline reading: "Pryor Legal Firm Threatens Lawsuit". Under the headline, the following print appeared as a prelude to the letter:

2. The letter forwarded by the law partner read: "Gentlemen: I understand that certain letters and other documents have been presented to you by Barbara Pierce in connection with certain real estate transactions she entered into with Glen H. Weaver.

Certain allegations contained in these documents particularly with reference alleged activities by Mr. Tony Jack Lyons, a member of the law firm, are untrue. The untrue allegations in our opinion accuse Mr. Lyons and thereby our law firm of entering into a conspiracy against the interests of our client, and fraudulently misleading Mrs. Pierce with reference to the content and meaning of a contract which we prepared. These allegations are completely untrue.

I feel that any publication in your newspaper, whether by way of news story, letter to the

editor, or paid advertisement, of these documents, or the statements made by Mrs. Pierce concerning this transaction would be false and malicious and would tend to injure me, my law firm, and my partner, and would constitute actionable libel as defined by 12 O.S. § 1441, et seq.

We therefore demand that you refrain from publishing any such allegations. We feel that our firm would suffer damage thereby which would be irreparable should you publish these malicious untruths, and that you would probably be legally responsible for substantial damages which we would suffer.

Should you have any questions, we would be happy to discuss this matter with you further.
                    LYONS & DEAN
                    /s/ Gary J. Dean"

"EDITOR'S NOTE: (A highly unusual letter to the editor reached this paper recently. It was so unusual the contents are being printed on page one rather than following the usual format."

And, following, the letter as set out in footnote 2 was published as a front-page item in the *Jeffersonian*.

An affidavit, executed by both Gaithers in support of their motion for summary judgment acknowledged receipt of the disputed letter to the editor from Avery; that the sheriff's race was hotly contested; that charges and counter-charges had gained wide spread public comment and discussions in the Pryor community; that neither Gaither had any reason to believe or any evidence causing them to suspect the information in the Avery letter was false.

Gaither's amended answer alleges the defamatory words to be true in substance and fact, and that they acted without malice.

On the other hand, Weaver submitted an affidavit stating that the Gaithers held ill will and malice towards his lawyer because of previous litigation, and the lawyer's part ownership in a competition newspaper. Affiant Weaver also concluded that the malice against the attorney was imputed to him by reason of his association with the lawyer.

An additional factor to be taken into consideration in reviewing the trial court's ruling of summary judgment is that in the *Jeffersonian* issue carrying the Avery letter, there was printed in large type, and in juxtaposition to the Avery letter, another "letter to the editor" purportedly written by one Jane Callison Cowan. The Cowan letter appeared surrounded with black border and the word "NOTICE" appearing at the top in extremely large type. The Cowan letter likewise referred to Weaver, his official conduct, and his association with his law firm.[3]

As was the case with the Avery letter, no individual connected with the *Jeffersonian* made any inquiry into the purported facts reported in the Cowan letter.

However, the deposition of Charles M. Cooper, publisher of the competitor newspaper, *The Pryor Daily Times,* clearly demonstrates he made an investigation into the allegations of the Cowan letter and found them to be untrue. Cooper's investigation and follow-up newspaper story quoted from actual Court records.

We are not directed to any authority which indicates that a newspapers' duty is any different with regard to a "letter to the editor" written by a third person than is the duty owing from an article written by it's staff. Although not briefed, an important patent question is whether or not a "letter to the editor", published and disseminated by the public news media, may be the foundation for actionable libel.

3. The Cowan letter, as published, read: "NOTICE—To the Editors of: THE PRYOR DAILY TIMES, THE PRYOR JEFFERSONIAN or TO THE VOTERS OF MAYES COUNTY WHOM IT MAY CONCERN AND RADIO STATION KOLS.

A situation has developed in the candidacy for Sheriff of Mayes County that requires some clarification and thought by the Voters.

While PETE WEAVER was sheriff an arrest was made at WEAVER'S order of Oran Callison (A life long resident of Mayes County, and a respected Cattleman and Farmer) at Locust Grove WITHOUT A WARRANT and no charges filed.

Callison was placed in the County Jail on no more Legal Authority than a telephone call from a LAWYER requesting this arrest. Weaver was fully aware of its illegality.

Oran Callison was held in a cell of the County Jail for 5 hours, was not allowed any communication by telephone or otherwise. A local attorney however was informed of WEAVER'S action and proceeded to the Jail where he secured Callison's release.

It appears that the O.K. CEMENT PLANT ordered the Law Firm retained by them to take necessary steps to restrain Callison from securing water for his starving cattle from a water line which was installed across Callison land. This Water Line was subsequently proved in court to have been layed in trespass against Callison's protest and of course the case by the O.K. CEMENT PLANT was dismissed.

I do not believe the people of Mayes County should elect a Sheriff who is DOMINATED AND CONTROLLED by any one LAW FIRM OR PRIVATE CORPORATION to the point of using the Office of Sheriff for illegal and dictatorial action.

A CHECK OF THE COURT RECORDS WILL SUBSTANTIATE THE ABOVE FACTS!
Jame Callison Cowan"

A "letter to the editor" accusing a university professor of treason was the subject matter of a libel action in *El Paso Times, Inc., Petitioner v. Trexler, Texas,* 447 S.W.2d 403 (1969). In *Trexler,* the Texas Court applied the *New York Times* standard, together with its progeny, to a college professor who had thrust himself into a vortex of public controversy. *Trexler* concluded that the alleged libelous "letter to the editor" was not actionable as a matter of law because of an absence of any evidence that the defendant newspaper published the letter "with knowledge that it was false or with reckless disregard of whether it was false or not". By reason of *Trexler* we are of the opinion that when the public media re-publishes and circulates a "letter to the editor" which contains libelous statements, such publication may be the subject of an action in libel, subject to the rules of law as hereinafter discussed.

Scrutiny of decisional law governing libel, commencing with *New York Times, supra,* reveals that the maturation of our libel law has evolved separate but definitive standards for two classes of persons who claim to have been unlawfully defamed, i. e., public figures or public officials, and private individuals.

The standard enunciated in *New York Times,* as later extended, bars liability for defamation of a "public figure" absent proof that the defamatory statements were published with knowledge of their falsity or reckless disregard of the truth.

This Court, in *Washington v. World Publishing Co.,* Okl., 506 P.2d 913 (1972) embraced and refined the *New York Times* standard in refusing recovery on summary judgment where there was no factual showing of highly unreasonable conduct consisting of extreme departure from the standard of investigation in reporting ordinarily adhered to by responsible publishers, and where there was no showing of either actual awareness of probable falsity or that the article was so inherently improbable that only a reckless person would have put it in circulation. *Washington* involved a private individual who had become a public person because of political activities.

*Martin v. Griffin Television Inc.,* Okl., 549 P.2d 85 (1976) addresses the issue of the standard to be applied to purported defamatory falsehoods directed toward a private individual. It was therein held:

"We conclude a reasonable balance between the right of the news media and the right of the private individual is best achieved by the negligence test. (Citing 76 O.S.1971, § 5(a))

"Ordinary care is that degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under similar circumstances, and the failure to exercise such ordinary care would be negligence. (Citing cases)"

After promulgation of *Martin, supra,* in January, 1976, the Supreme Court of the United States, on March 2, 1976, decided *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), wherein that august tribunal refused to require a non-public figure to prove either actual malice, knowledge of falsity, or publication with reckless disregard of the truth as predicates to recovery of money damages for libel.

While the majority of the Court in *Firestone* adhered to the rationale of *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), holding there could be no liability for dissemination of defamatory writings absent proof of fault, the majority did not establish a concept of fault in establishing liability in an action for libel brought by a non-public figure plaintiff. However, Mr. Justice Powell filed a separate concurring opinion in *Firestone* emphasizing that the States may define for themselves the appropriate standard of liability for a publication of defamatory falsehoods injurious to a private individual.

In a most significant manner, Mr. Justice Powell wrote that there was no First Amendment constraint against allowing recovery upon proof of *negligence.* The apparent applicability of the negligence standard is limited however, to those circumstances where the "substance of the defam-

atory statement 'makes substantial danger to reputation apparent'." Citing *Curtis Publishing Co. v. Butts*, 398 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

■ We therefore reaffirm our pre-*Firestone* analysis of the standard applicable to private individuals as pronounced in *Martin, supra,* i. e., "the right of the news media and the right of the individual is best achieved by the negligence test," except for punitive damages.

We are then called upon to determine if appellant was a "public figure" within the purview of the First and Fourteenth Amendments. Most persuasive is the definition of "public figure" as found in *Gertz v. Welch, supra:*

"For the most part those who attain this status (public figure) have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."

■ We adopt the *Gertz* test in ascertaining if a particular allegedly defamed person is a "public figure" and subject to the *New York Times* rule. Applying the *Gertz* test to the case at bar, unquestionably the filing of a declaration of candidacy for public office places the declarant in the position of special prominence in the resolution of a public issue, that is, the election of a candidate to public office by the voting citizenry.

■ We next come to the propriety of the trial court's sustention of defendant's motion for summary judgment. Summary judgment is authorized by Rule 13, 12 O.S. Supp.1974, Ch.2-Appx. In review of denial of summary judgment, this Court will examine the pleadings and evidentiary materials to determine what facts are material to plaintiff's cause of action, and to determine whether the evidentiary materials introduced indicate that there is no substan-

tial controversy as to one material fact and that this fact is in movant's favor. *Runyon v. Reid,* Okl., 510 P.2d 943, 58 A.L.R.3d 814 (1973). Also, on motion for summary judgment all inferences and conclusions to be drawn from underlying facts contained in such materials as affidavits, admissions, depositions, pleadings, exhibits and the like, must be viewed in a light most favorable to party opposing the motion. *Northrip v. Montgomery Ward & Co.,* Okl., 529 P.2d 489 (1974).

While ordinarily the burden of proving actual malice is upon the official who complains of defamation, it was held in *Tagawa v. Maui Publishing Co.,* 49 Haw. 675, 427 P.2d 79 (1967), that on a motion by defendant for summary judgment in a libel action, the defendant has the burden of showing there is no issue of actual malice in the case.

■ Motion for summary judgment should be denied if the facts concerning any issue raised by the pleadings and affidavits thereinafter filed in the case are conflicting, or if reasonable men, in exercise of fair and impartial judgment, might reach different conclusions from undisputed facts concerning any issue as set forth in such instruments. *Northrip v. Montgomery Ward & Co., supra.*

By statute in Oklahoma, libel is defined as "a false or malicious unprivileged publication by writing," etc. 12 O.S.1971, § 1441. Before *New York Times,* malice, in its generic sense, was no part of a cause of action in libel. *Craig v. Wright,* 169 Okl. 245, 43 P.2d 1017. Now, the phrase "actual malice" is a federal constitutional prerequisite to the recovery by a public official or person involved in a public controversy. The *New York Times* rule clearly means that in such a case, the defamatory statement must be made with knowledge of its falsity or with reckless disregard of whether it was false or not.

The decisive issue on this appeal is the correctness of the trial court's sustention of summary judgment when the record discloses all the facts and circumstances outlined in this opinion. We believe the trial court clearly erred in its judgment.

The totality of all circumstances presented by the depositions and pleadings together with affidavits reveals a strained relationship between the plaintiff and defendants. This fact taken together with the content of the publications, the time of their publication with regard to the election [4], the fact that appellee Haskell Gaither and appellant's opponent in the election were related by marriage, and the total failure of appellees to make any inquiry into the truth of the inherently improbable statements is, in our opinion, sufficient to raise a question in the minds of reasonable men as to whether the defendants below acted with actual malice or were guilty of "highly unreasonable conduct constituting extreme departure from standards of investigation in reporting ordinarily adhered to by responsible publishers".[5] The issue is one for the trier of the facts and not for a judge to declare on summary judgment. We observe that summary judgment is a lethal weapon and courts must be mindful of its aims and targets and beware of overkill in its use. *Brunswick Corp. v. Vineberg*, C.A.Fla., 370 F.2d 605 (1967).

The order of the trial court granting summary judgment for defendants is therefore REVERSED AND THE CAUSE REMANDED FOR FURTHER PROCEEDINGS.

HODGES, C. J., LAVENDER, V. C. J., and DAVISON, WILLIAMS, IRWIN, BERRY and BARNES, JJ., concur.

---

4. It is to be noted that by reason of publication in the final paper before the election was to be held, Oklahoma's "Honest Mistake Law" is inapplicable. (12 O.S.1971, § 1446a)

5. *Washington v. World Publishing Co., supra.*