Hill HODGES, Appellant,

v.

OKLAHOMA JOURNAL PUBLISHING COMPANY and Larry
Cannon, Appellees.

No. 51397.

Supreme Court of Oklahoma.

June 24, 1980.

Rehearing Denied Oct. 14, 1980.

B. J. Brockett and John A. Green, Oklahoma City, for appellant.

Kenneth N. McKinney, McKinney, Stringer & Webster, Oklahoma City, for appellees.

IRWIN, Vice Chief Justice.

Appellant, Hill Hodges, a former Oklahoma County license tag agent, brought suit to recover damages alleging that four articles, with accompanying headlines, published by the appellee, Oklahoma Journal Publishing Company, and written in part by its reporter, appellee Cannon, were libelous. The trial court granted summary judgment in favor of the appellees and appellant appealed. On assignment, the Court of Appeals, Division 2, reversed and remanded for further proceedings. Appellees seek certiorari.

The articles in question were published after appellant left his position as tag agent, and occurred over an eighteen–day period during which certain questions were raised concerning appellant's entitlement to various funds which he had collected as tag agent. The first article appeared on August 13th, and was headlined:

"AUDIT TURNS UP TAG SLUSH FUND".

This was followed by a tag–line reading "Report accuses Hodges", and a story discussing questions raised by an audit conducted by the State Examiner and Inspector.

The second article appeared on August 17th, and was headlined:

"DA Awaits Evidence In Tag Agent Audit".

This was followed by a story which said the District Attorney for Oklahoma County would not consider the prosecution of appellant until someone presented "solid evidence" of some offense.

The third article appeared on August 28th, and was headlined:

"AGENT TO PUSH TAG FUND HUNT".

The tag–line stated "Former Official Accused". There followed a story which indi-

cated that the tag agent who replaced appellant was seeking an opinion from the Attorney General as to appellant's entitlement to the disputed funds.

The fourth article appeared on August 31st, and was headlined:

"Ex–Tag Agent to Return Money".

This was followed by a story revealing that appellant had filed a declaratory judgment action seeking to determine ownership of the funds in question, and had agreed to deposit approximately $55,000.00 with the court clerk pending the results of the action.

Appellees. filed a motion for summary judgment and attached Cannon's affidavit in which he affirmed that he had written the articles in good faith, naming the sources upon which he had relied. Appellees argued appellant was a "public official" who was required to show that the publications were made with "malice", i. e., with knowledge of falsity or in reckless disregard of the truth. Appellant responded with his own affidavit stating that the "slush fund" headline was not true, and that nothing in the audit of the State Examiner and Inspector revealed such a "fund", which appellant defines as one used "for bribery or corruptive propaganda." In addition he attached other affidavits and documents attesting to the accuracy of a copy of the audit, and a press release issued after the audit by the Examiner and Inspector. He argues that he was not a "public official" and was therefore not required to show "malice", and in any event, "malice" was shown by sufficient evidence to prevent summary judgment. The trial court, in a written opinion, determined that appellant was a "public official" and was required to show "malice" in order to recover. Determining that the evidentiary materials presented showed no controversy as to these material issues, the trial court granted summary judgment to the appellees, and this appeal followed.

■ Appellant's "status" is relevant in determining the standard by which appellees' actions must be measured. Since *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), it has been clear that in order for a "public official" to recover for defamation he must demonstrate that publication was with "actual malice", i. e., with knowledge of the falsity of the statement, or in reckless disregard of the truth. Query: Is appellant a "public official"? Appellees insist, and the trial court found, that appellant is a "public official". On the other hand, appellant argues there is at least a jury question concerning his "status", and summary judgment was improper.

■ Whether appellant was a "public official" within *New York Times* may not be determined by reference to state–law standards. States have developed definitions of "public officials" for local administrative purposes, not for purposes of a national constitutional question. The standards that set the scope of constitutional protection afforded free expression may not vary between states. The "public official" designation within *New York Times*

"... applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

In *Johnston v. Corinthian Television Corporation*, Okl., 583 P.2d 1101 (1978) we held that a physical education teacher, who was also an elementary wrestling coach, met the government "employee" test, and said:

"A person may become a public official within contemplation of the *New York Times* rule in either of two ways. First, as that case itself illustrates, he may be an elected official, and the alleged libel must relate to his official capacity. Second, as the Court held in *Rosenblatt v. Baer*, he may be a government employee with such responsibility that the public has an independent interest in his position and performance, and the alleged libel must relate to his official capacity."

Clearly, appellant is not an elected official, and any designation of him as a "public

official" must be based upon the approach recognized in *Rosenblatt, supra*. It is not denied that as tag agent appellant held a position of substantial public impact, and had duties which involved the collection and accounting for substantial amounts of public funds, as well as administering an area of the law which affected practically every citizen of Oklahoma County, the area in which he served.

Despite this broad range of public duties and responsibilities and the impact his performance of those duties had upon the public, appellant contends he was not a "public official" or government "employee" but an "independent contractor" and the "public official" standard adopted in *New York Times* would not be applicable to him.

The phrase "governmental employee" as used in the test articulated in *Rosenblatt* was not intended to limit it to those individuals who have a traditional "employee–employer" relationship with a governmental unit. It extends to those who have, or appear to have, substantial responsibility for or control over the conduct of governmental affairs and the alleged libel must relate to this official capacity. The trial court properly determined that appellant was a "public official" within *New York Times*.

The next issue relates to the published articles and whether the trial court erred in rendering summary judgment in favor of appellees. Under the mandate of *New York Times* it is an incumbent upon this court to consider the law and to make an independent evaluation of the record to insure the constitutional protection of the First Amendment.

This controversy centers around the import of the headlines and whether the headlines may be read apart from the stories which followed. Appellant contends that the headlines, particularly the "slush fund" headline, convey ideas to the readers which are completely separate from the information contained in the stories. Appellant argues that since the "message" of the "slush–fund" headline is not supported by the story, there is an inference that appel-

lees either knew the headline was false or had serious doubts about its truth. Appellees contend that the "slush–fund" headline is not at variance with the story and that the entire published article must be considered.

The meaning of the term "slush fund" as used in the headline provides a part of the area of conflict. Appellant relies primarily upon a definition contained in the Random House Dictionary of the English Language, the Unabridged Edition (1967) which states:

"1. A sum of money used for illicit or corrupt political purposes, as for buying influence or votes, bribing public officials, or the like; . . ."

The American Heritage Dictionary of the English Language (1975) defines "slush fund" as:

"1. A fund raised for undesignated purposes; especially: a. A fund raised by a group, such as office employees, for entertainment or the like. b. A fund raised by a political group for bribery or other corrupt practices; . . ."

Based upon those definitions, appellant contends that the headline indicates that the audit turned up a fund for bribery and corrupt political practices. Since the audit made no such finding, appellant argues that appellees lacked any factual information to support such an allegation and "serious doubts" may be inferred. See *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, (1968).

Appellees contend that the definition is not so clear. They point to the definition as a "fund raised for undesignated purposes", and argue that it is ambiguous and therefore must be read with the accompanying article in order to ascertain its true intended meaning.

In *New York Times*, the United States Supreme Court balanced the interests of the public in robust discussion of the conduct of public business by public officials against the long–recognized personal interest of public officials in their reputation. The Court determined that the First Amendment restricted the right of such

individuals to recover under traditional theories of defamation to specific factual circumstances. It concluded that our national commitment to free discussion and comment dictated that public officials be required to demonstrate that allegedly defamatory statements about which they complained were published either with knowledge on the part of the publisher that the statements were false, or in "reckless disregard" of the statement's truth. Subsequently, in *St. Amant v. Thompson, supra*, the Court refined its definition of "reckless disregard" to mean a showing that the statement was made despite the fact that the publisher "entertained serious doubts [about its] truth."

In *Washington Post Co. v. Chaloner*, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987, (1919), the Court stated:

"A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so ambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read."

Appellant cites *Sprouse v. Clay Communication, Inc.*, W.Va., 211 S.E.2d 674 (1975) as a case similar to the case at bar. In *Sprouse* the court held:

"Where oversized headlines are published which reasonably lead the average reader to an entirely different conclusion than the facts recited in the body of the story, and where the plaintiff can demonstrate that it was the intent of the publisher to use such misleading headlines to create a false impression on the normal reader, the headlines may be considered separately with regard to whether a known falsehood was published."

In *Sprouse* the court also held that personal motives on the part of a newspaper or participation by it in a plan or scheme to injure a public figure is evidence of reckless and willful disregard for the truth which may be considered on the question of actual malice; and where the defendant newspaper abdicated its traditional role of fairly reporting the news and became a participant in a scheme or plan to destroy the plaintiff's character and where defendant fully cooperated with plaintiff's political opponent in disseminating defamatory articles to other newspapers, the difference between the fair implication of the headlines as opposed to the supporting factual recitations of the stories, was evidence of malice.

The trial court's judgment must be affirmed under the mandate of *New York Times* if there is no evidence that the articles were published with "actual malice", i. e., with knowledge of their falsity, or in reckless disregard of the truth.

The *Sprouse* case relied upon by appellant will not support his position. There is no evidence refuting Cannon's affidavit in which he affirmed he had written the article in good faith, or that the publication was in conflict with the information he had obtained, or that the source from which he obtained the information was unreliable. And there is no evidence that appellees had any personal motive to injure appellant in any way or that appellees abdicated their traditional roles of fairly reporting the news. If there is any evidence of "actual malice" it must be gleaned from the publication and not from the conduct of appellees.

The headlines involved here are, at most, ambiguous in their defamatory content, and it would be inappropriate to isolate them from their explanatory articles, especially in the absence of any evidence that the appellees intended to imply any meaning in the headline which was not supported by the

accompanying story. The headlines are susceptible of "innocent" meanings, and it is improper to conclude, without other evidence to support that conclusion, that the appellees intended the defamatory meaning, knew that it was not supported by the facts contained in the story, and thus had "serious doubts" about the truth of the headline.

The Supreme Court of Washington reached a similar conclusion when faced with a similar "gap theory" in *Tilton v. Cowles Publishing Company*, 76 Wash.2d 707, 459 P.2d 8 (1969). There the court determined that where there was no evidence that the publisher intended or was aware of a potentially defamatory meaning of an article, which meaning was admittedly at variance with the known truth, "malice" as required by *New York Times, supra,* could not be inferred.

The evidence presented by the appellees in support of the Motion for Summary Judgment placed the burden upon the appellant to come forward with some evidence to demonstrate the existence of a question as to the existence of "malice". As we hold here that "malice" may not be inferred from any difference in meaning between the ambiguous headline and the accompanying article, the trial court was correct in granting summary judgment to appellees.

CERTIORARI GRANTED; OPINION OF COURT OF APPEALS VACATED; JUDGMENT OF THE TRIAL COURT AFFIRMED.

LAVENDER, C. J., and HODGES, BARNES and SIMMS, JJ., concur.

WILLIAMS, DOOLIN and HARGRAVE, JJ., concur in part, dissent in part.