**Clara LUPER, Appellant,**

v.

**The BLACK DISPATCH PUBLISHING COMPANY, an Oklahoma corporation; Richard K. Nash; Dr. Johnson W. Sanford; and Dr. Gravelly E. Finley, Appellees.**

No. 58246.

Court of Appeals of Oklahoma, Division No. 2.

Sept. 6, 1983.

Rehearing Denied Oct. 21, 1983.

Certiorari Denied Jan. 10, 1984.

Released for Publication by Order of Court of Appeals Jan. 16, 1984.

E. Melvin Porter, Oklahoma City, for appellant.

C. William Threlkeld, Fenton, Fenton, Smith, Reneau & Moon, Woodrow H. McConnell, McConnell & Wall, Oklahoma City, for appellees.

BOYDSTON, Judge.

Plaintiff Clara Luper brought this libel action against Defendant newspaper company, The Black Dispatch Publishing Company, Richard K. Nash (Editor), and Drs. Johnson W. Sanford and Gravelly E. Fin-

ley, board members, officers, and owners of the paper (Owners) for publishing two allegedly libelous news articles. Plaintiff appeals trial court's granting of summary judgment in favor of Defendants.

Although not specifically stated in the journal entry of judgment, trial court's ruling, according to the briefs, was based upon a finding that the record contained no evidence to support the allegation that the lies were published with actual malice or that they were published with reckless disregard for the truth or falsity of the matters asserted. We find trial court erred as a matter of law and reverse.

Plaintiff is an Oklahoma City public school teacher and a well-known civil rights worker, radio show hostess, and author. Defendant newspaper is published weekly and distributed to 50 states and seven foreign countries.

The first news article was printed by Defendants on October 30, 1980. It stated that Thomas J. Clark of Tulsa [now deceased] claimed that Plaintiff is "living in adultery" and is "a bigamist." The article referred to a court case number, supplied by Clark, to support Clark's claim that Plaintiff, now remarried, never obtained a legal divorce from him.

The sole basis for this article was a copy of a mailgram (one of 60,000 supposedly distributed throughout Oklahoma by Clark) addressed to John Marshall High School in Oklahoma City, in which Clark demanded the school discharge Plaintiff because of the alleged crimes. This copy came into Defendants' hands more than five months after its initial distribution. The tone and tenor of the scandalous material is, on its face, venomous and obviously consists of the rantings of a bitter ex-husband. More importantly, the material was all lies, the falsity of which could have been determined by a simple telephone call to the local court clerk. However, Defendant Editor testified he did not check the court file nor contact Plaintiff before publishing this first article. He claims to have printed the story without knowledge of the truth or falsity of the allegations.

After publication Plaintiff protested to Editor that the article was libelous, asked him not to print any further allegations by Clark, and informed Editor that Clark had been committed to a mental hospital. Editor was also warned by newspaper owner Defendant Sanford not to pursue the topic.

Nevertheless, one week later, Editor printed a second libelous article, along with an editorial comment below it. This article specifically called attention to the previous publication, characterized the piece as an "update," and conceded that "upon further investigations," Defendant found that Clark and Plaintiff were indeed legally divorced as of late 1970.

The article continued, however, with more accusations by Clark, taken from Defendant Editor's telephone interview with him. The article stated, in part:

"Thomas J. Clark charges that Clara Luper along with her lawyer at the time, [a] former District Judge ... of Tulsa, Oklahoma, [now an Oklahoma Supreme Court Justice] and several others were involved together in a gangster style plot against him. [criminal conspiracy] In the March 10, 1977 issue of the Oklahoma Eagle, page 5, section 8 an explicit article was published concerning Thomas J. Clarks [sic] charges. [republishing the libel by inviting readers to refer back to previously printed lies] In the 1974 January/February issue of Progress Magazine, Hank Moore-Editor, also went into mass detail concerning Thomas J. Clark and his alledged [sic] conspiracy against him.

"Thomas J. Clark states that he was sent to prison and to the Oklahoma State Mental Hospital in Vinita, Oklahoma all on false charges against him. [perjury and criminal conspiracy] Thomas J. Clark also states that while he was in detention he was tricked, schemed upon, double-crossed, and defrauded out of his lifetime investments of $200,000 or more, he further states that there was no Doctor, Authority, or trained Psychiatrist, of any kind, to testify, or to give proof or

statement as to his need for mental evaluation. [criminal fraud and conspiracy]

"Thomas J. Clark stated that at present, a total of 32 persons have mysteriously died [mass murder] who could have testified on his behalf, and a number of lives have been threatened, [felonious threats] if they take the witness stand to testify in support of his case. Thomas J. Clark also stated in February of 1972 his close associate was offered $25,000.00 to kill him. [conspiracy to commit murder] Thomas J. Clark told the Black Dispatch that he would continue his fight until he finds justice in the court system." (Bracketed material added.)

■ Plaintiff contends these articles are libelous per se because they charge her with criminal acts. We agree.

The related editorial comment printed in the second issue stated the paper was "neutral" regarding conflict between Plaintiff and Clark, an apparently naive attempt to insulate itself from libel litigation.

■ Editor testified that before the second article was printed, he interviewed Clark and believed him to be a "reliable source." Editor testified he had no malice when he published what he thought was "newsworthy" and "more probably true than not." Editor claimed to retain this belief, despite the fact he had personally investigated the previous lies told by Clark relative to the adultery and bigamy charges and knew Clark to be an ex-convict[1] and ex-mental patient. In this regard, Editor displays a remarkably tenacious intellectual innocence rarely found amidst the publishing community, for the second catalogue of lies told by Clark and printed by Defendants, on its face, reveals the same venomous, nearly hysterical, outrageous quality as the first set of lies reveals, if not more so. We find Editor's bare assertion of a lack of malice to be unpersuasive and grossly outweighed by other, more objective evidence.

**1.** Clark had previously been convicted of crimi-

## I

The issue on appeal is whether summary judgment was properly granted. Based on our review of the record and the applicable law, we conclude it was not.

The trial court's decision must turn on whether the evidence and pleadings raise controverted material facts under the constitutional libel standards established by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and reiterated by our supreme court in *Miskovsky v. Oklahoma Publishing Co.*, Okl., 654 P.2d 587 (1982), *cert. denied*, — U.S. —, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982).

The standard put forth in *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 725–26 (emphasis added), is:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with *'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not . . . .*"

■ First, it is conceded that Plaintiff is a "public official" by virtue of her position as a public school teacher. *Johnston v. Corinthian Television Corp.*, Okl., 583 P.2d 1101 (1978). She is also a "public figure" within the meaning of *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (extending the *New York Times Co.* rule for "public officials" to include "public figures") by virtue of her civil rights work, radio show, and books.

■ The defamatory allegations of the crimes of adultery, bigamy, and criminal conspiracy have been held as a matter of law to directly relate to a public official's conduct. As the Supreme Court stated in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971):

nal libel.

"The respondent argues that under *New York Times* a plaintiff has a special burden of proof only as to libels 'relating to official conduct,' that for a candidate 'official conduct' means 'conduct relevant to fitness for office,' and that the public-private issue is one of fact for the jury. In our view, however, the syllogistic manipulation of distinctions between 'private sectors' and 'public sectors,' or matters of fact and matters of law, is of little utility in resolving questions of First Amendment protection.

"In *Garrison v. Louisiana*, [379 U.S. 64 [85 S.Ct. 209, 13 L.Ed.2d 125] (1964)] ... [t]his Court rejected the proposed distinction:

'Of course, any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The *New York Times* rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.' 379 U.S., at 76–77, 85 S.Ct. at 216–217....

.    .    .    .    .

"We therefore hold as a matter of constitutional law that a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's ... fitness for office for purposes of application of the 'knowing falsehood or reckless disregard' rule of *New York Times Co. v. Sullivan....*" [2]

**2.** Thus we have the anomalous legal result that public officials or public figures may be libeled almost without recourse concerning conduct clearly outside the scope of their official conduct, even with lies that refer to purely personal areas of their lives. The anomaly is, if one believes the dictum in federal cases, that when the libel amounts to only minor misconduct (less than a crime) the publisher is under an affirmative duty to investigate because only negligence, the same standard that applies to private citizens, need be proved by a plaintiff in that situation. However, if the lie is truly damaging, such as a felony accusation, the publisher need only check the veracity of the material with minimal care because plaintiff must prove "actual malice," rendering negligent investigation alone insufficient.

"We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included.... Nor need we here determine the boundaries of the 'official conduct' concept." *New York Times Co. v. Sullivan*, 376 U.S. 254, 283 n. 23, 84 S.Ct. 710, 727 n. 23, 11 L.Ed.2d 686 (1964). "This is not to say that the Constitution protects defamatory statements directed against the private conduct of a public official or private citizen.... Purely private defamation has little to do with the political ends of a self-governing society." *Id.* at 301, 84 S.Ct. at 737 (opinion of Justices Goldberg and Douglas, concurring in result). "In most cases, as in the case at bar, there will be little difficulty in distinguishing defamatory speech relating to private conduct from that relating to official conduct. I recognize, of course, that there will be a gray area." *Id.* at 302 n. 4, 84 S.Ct. at 737 n. 4.

*But see Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), wherein the Court said: "We recognize that different interests may be involved where purely private libels, totally unrelated to public affairs, are concerned; therefore, nothing we say today is to be taken as intimating any views as to the impact of the constitutional guarantees in the discrete area of purely private libels." *Id.* at 72 n. 8, 85 S.Ct. at 214 n. 8. "Of course, any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The *New York Times* rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character." *Id.* at 77, 85 S.Ct. at 217. *See also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277, 91 S.Ct. 621, 628, 28 L.Ed.2d 35 (1971), wherein the Court stated: "We therefore hold as a matter of constitutional law that a charge of criminal con-

A public figure or public official must prove that the defamatory falsehood was made with "actual malice"; *i.e.,* made with knowledge that it was false or with reckless disregard of whether it was false or not. *Miskovsky v. Oklahoma Publishing Co.,* Okl., 654 P.2d 587 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). *Accord, Jurkowski v. Crawley,* Okl., 637 P.2d 56 (1981); *Hodges v. Oklahoma Journal Publishing Co.,* Okl., 617 P.2d 191 (1980); *Morgan v. Winters,* Okl., 594 P.2d 1220 (1979); *Johnston v. Corinthian Television Corp.,* Okl., 583 P.2d 1101 (1978); *Akins v. Altus Newspapers, Inc.,* Okl., 609 P.2d 1263 (1977); *Washington v. World Publishing Co.,* Okl., 506 P.2d 913 (1972). The actual malice standard of fault applicable to public plaintiffs is, of course, a federal constitutional standard established in *New York Times Co. v. Sullivan, supra,* and later refined in such cases as *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

In order to prove actual malice, the plaintiff must prove that the defendant "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. at 1325, or had a "high degree of awareness of ... probable falsity," *Garrison v. Louisiana,* 379 U.S. at 74, 85 S.Ct. at 215.

The actual malice test is subjective. *Herbert v. Lando,* 441 U.S. at 160, 99 S.Ct. at 1640; *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 334 n. 6, 94 S.Ct. 2997, 3004 n. 6, 41 L.Ed.2d 789 (1974); *Jurkowski v. Crawley,* 637 P.2d at 62. That is, actual malice "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. at 1325. Failure to investigate or inadequacy of investigation alone does not constitute actual malice. *St.*

*Amant v. Thompson,* 390 U.S. at 733, 88 S.Ct. at 1326; *Miskovsky v. Oklahoma Publishing Co.,* 654 P.2d at 596; *Jurkowski v. Crawley,* 637 P.2d at 60–62. The plaintiff "must ... show that the state of mind required was brought home to the persons in [the defendant's organization] having responsibility for the publication" of the allegedly libelous statement. *Miskovsky v. Oklahoma Publishing Co.,* 654 P.2d at 591. "*It is proof of the guilty knowledge prior to publication that demonstrates the First Amendment immunity does not apply;* ·nothing more is required to escape defendant's summary judgment and nothing less is permitted." *Jurkowski v. Crawley,* 637 P.2d at 62 (emphasis added).

Although failure to investigate does not in itself establish bad faith, the *St. Amant* Court noted that media defendants cannot automatically insulate themselves from liability for defamation by a bare assertion that they believe the lies to be true:

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. *The finder of fact must determine whether the publication was indeed made in good faith.* Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732, 88 S.Ct. at 1326 (emphasis added).

## II

Summary judgment is authorized by District Court Rule 13, 12 O.S.1981, Ch. 2,

---

duct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office for purposes of

application of the 'knowing falsehood or reckless disregard' rule of *New York Times Co. v. Sullivan.*"

App. When reviewing a summary judgment, this court will examine the pleadings and evidentiary materials to determine what facts are material to plaintiff's cause of action and to determine whether the evidentiary materials introduced indicate that there is no substantial controversy as to a material fact. *Runyon v. Reid*, Okl., 510 P.2d 943 (1973). All inferences and conclusions to be drawn from underlying facts such as affidavits, admissions, depositions, pleadings, and exhibits, must be viewed in a light most favorable to the party opposing the motion. *Northrip v. Montgomery Ward & Co.*, Okl., 529 P.2d 489 (1974). We believe the trial court clearly erred in its judgment.

After the first publication, unlike the defendant in *St. Amant v. Thompson, supra,* Defendants in the instant case had ample reason to doubt the veracity of Thomas J. Clark. Before the second publication Plaintiff notified Defendants as to the falsity of the articles as well as to Clark's mental state; and, armed with this information, Defendants had a duty to view any of Clark's future statements with commensurate skepticism. Defendant Editor Nash nevertheless printed the second article based on even more patently scandalous material supplied by Clark, whom Defendant Editor now knew to be an outrageous liar and embittered ex-husband. "It is proof of the guilty knowledge *prior to publication* that demonstrates the First Amendment immunity does not apply ...." *Jurkowski v. Crawley*, 637 P.2d at 62 (emphasis added).

The *Jurkowski* court emphasized that the record was barren of evidence that the defendants had prior knowledge of the probable falsity of the statements. However, in the instant case, there is sufficient evidence which, if believed by the jury, proves Defendants knew better.

We conclude that as to the second publication, a jury could justifiably find that Editor acted with a high degree of awareness of the probable falsity of the material and that the publication was not made in good faith. And, under these facts, whether Defendants acted in reckless disregard of the truth is a question of fact for the jury.

Standing alone, there is no affirmative evidence in the record to demonstrate that the first publication was made with actual malice—that Defendants entertained serious doubts as to the truth of the publication or that they had a high degree of awareness of probable falsity or acted in reckless disregard for its truth or falsity. However, the clearly libelous second publication, together with all its surrounding circumstances, necessarily also casts grave doubt on Defendants' initial publication. Had the first publication been the *sole* publication, we have serious doubts that it, alone, could withstand the rigorous First Amendment tests set forth in the controlling federal decisions. However, the second publication, taken together with the first, supplies circumstantial proof not otherwise independently inferable from the first. We compare it by analogy to the case where a man discharges his gun from his window into the crowded street and kills a passer-by. From these facts alone we cannot presume he intended to kill or even to harm because we cannot inferentially rule out accident or mistake. After, however, he has been apprised of the damage he has inflicted, and yet he fires his gun again, all doubt is erased as to his intent the second time he fired. And, inferentially, the doubt as to his intent the first time he fired is also justifiably removed. Thus, in the present case, there is a substantial controversy as to material facts regarding both publications, and summary judgment was therefore error as to both.

### III

Defendants also seek to avoid liability by arguing they merely republished Clark's accusations found in the mailgram and thus made no libelous statements of their own. In *Weaver v. Pryor Jeffersonian*, Okl., 569 P.2d 967, 971–72 (1977), the court said:

"We are not directed to any authority which indicates that a newspapers' [sic]

duty is any different with regard to a 'letter to the editor' written by a third person than is the duty owing from an article written by it's [sic] staff. Although not briefed, an important patent question is whether or not a 'letter to the editor', published and disseminated by the public news media, may be the foundation for actionable libel.

"... By reason of *Trexler* [*El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403 (Tex.1969)] we are of the opinion that when the public media re-publishes and circulates a 'letter to the editor' which contains libelous statements, such publication may be the subject of an action in libel, subject to the rules of law as hereinafter discussed."

We find Defendants' attempted distinction is without merit.

REVERSED AND REMANDED for further proceedings consistent with this opinion.

BACON, P.J., concurs.

MEANS, J., concurs in part and dissents in part.

MEANS, Judge, concurring in part and dissenting in part.

I concur in part and dissent in part.

The determinative issue in this defamation case is whether the defendants published the subject material with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not—thus yielding their first amendment protection.

The resolution of almost any legal issue in a defamation case must begin with the determination of the public or private figure status of the plaintiff because that status determines "the standard by which [the defendants'] actions must be measured." *Hodges v. Oklahoma Journal Publishing Co.*, Okl., 617 P.2d 191, 193 (1980).

Whether a plaintiff is a public official or public figure is a question of law for the court. *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Martin v.*

*Griffin Television, Inc.*, Okl., 549 P.2d 85, 89 (1976).

In her brief, Luper admits that she is "a public school teacher and a public figure." In a defamation action, whether the plaintiff is a public official is not determined by reference to state law standards. *Hodges v. Oklahoma Journal Publishing Co.*, 617 P.2d at 193. Rather, one may, in the context relevant here, be a public official either (1) by election to public office or (2) by being "a government employee with such responsibility that the public has an independent interest in his position and performance." *Johnston v. Corinthian Television Corp.*, Okl., 583 P.2d 1101, 1103 (1978). In *Rosenblatt v. Baer*, 383 U.S. at 85, 86 S.Ct. at 675, the Court stated: "It is clear, therefore, that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."

Thus, in cases decided by the United States Supreme Court, a city mayor, *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); a deputy chief of police, *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); a deputy sheriff, *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); a state court clerk, *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); a supervisor of a county ski and recreation area, *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); a judge, *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); and a city commissioner, *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), were held or assumed to be public officials. Scores of cases have been decided in the state and lower federal courts holding a government officeholder or employee to be a public official. *See* Annot., 19 A.L.R.3d 1361 (1968).

It is not necessary that the government employee be near the top of the official

hierarchy to be considered a public official for purposes of a defamation case. For example, a public school teacher, *Johnston v. Corinthian Television Corp.*, Okl., 583 P.2d 1101 (1978); an IRS agent, *Angel v. Ward*, 43 N.C.App. 288, 258 S.E.2d 788 (1979); the administrator of a county motor pool, *Clawson v. Longview Publishing Co.*, 91 Wash.2d 408, 589 P.2d 1223 (1979); the chief x ray technician of a county hospital, *Fopay v. Noveroske*, 31 Ill.App.3d 182, 334 N.E.2d 79 (1975); a county license tag agent, *Hodges v. Oklahoma Journal Publishing Co.*, Okl., 617 P.2d 191 (1980); a county social worker, *Press, Inc. v. Verran*, 569 S.W.2d 435 (Tenn.1978); and the manager of a community center, *Brown v. Kitterman*, 443 S.W.2d 146 (Mo.1969), have been held to be public officials. Similarly, whether the plaintiff is involved in "real" government or not does not matter. Thus, an elected member of a student senate at a university was considered just as much a public official as if he served in off-campus government, *Klahr v. Winterble*, 4 Ariz. App. 158, 418 P.2d 404 (1966).

In *Garrison v. Louisiana*, 379 U.S. at 77, 85 S.Ct. at 217, the Supreme Court stated that "any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation." The Court noted that personal attacks on integrity and honesty are directed to the very heart of an official's fitness for duty.

The Court took the *Garrison* standard even further in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277, 91 S.Ct. 621, 628, 28 L.Ed.2d 35 (1971), when it stated:

"[A] charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's ... fitness for office for purposes of application of the 'knowing falsehood or reckless disregard' rule of *New York Times Co. v. Sullivan*."

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), the Court held that the Constitution required "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." In *New York Times*, the Court recognized that the guarantees of freedom of the press protected by the first amendment will inevitably conflict with laws designed to protect one's reputation. Recognizing this tension, the Court identified public officials as a class of potential plaintiffs and held them to a particularly high standard regarding defamation actions—actual knowledge of the falsehood or a reckless disregard for the truth. The *New York Times* rule has been with us for nearly twenty years. The rule has been both expanded and explained yet the rule still seems to perplex our courts.[1]

As a public official and/or a public figure suing for defamation, Luper must meet this federal constitutional standard. She must prove that the defamatory falsehood was made with actual malice. This actual malice standard of fault "is *not* measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325 (emphasis added).

The actual malice test is entirely subjective. *Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979).

---

1.  *See* C. Lawhorne, *The Supreme Court and Libel* (1981); C. Morris, *Modern Defamation Law* (1978); R. Phelps & E. Hamilton, *Libel: Rights, Risks and Responsibilities* (rev. ed. 1978); R. Sack, *Libel, Slander, and Related Problems* (1980); Eaton, *The American Law of Defamation through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349 (1975); Elder, *The Law of Defamation and Constitutional Privilege: A Contextual Analysis of Oklahoma Law in Light of Gertz v. Robert Welch, Inc. through Hutchinson v. Proxmire*, 4 Okla. City U.L.Rev. 17 (1979); Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L.Rev. 1205 (1976); Nelon, *Media Defamation in Oklahoma: A Modest Proposal and New Perspectives—Part I*, 34 Okla.L.Rev. 478 (1981); Nelon, *Media Defamation in Oklahoma: A Modest Proposal and New Perspectives—Part II*, 34 Okla.L.Rev. 737 (1981).

Neither the failure to investigate prior to publication, nor the failure to realize the importance or the consequences of what is published are sufficient to establish a reckless disregard. *St. Amant v. Thompson,* 390 U.S. at 732–33, 88 S.Ct. at 1326. Instead, the "plaintiff must demonstrate *actual knowledge* of *probable falsity* to recover as a public official suing to recover for a defamatory falsehood." *Jurkowski v. Crawley,* Okl., 637 P.2d 56, 60 (1981) (emphasis supplied).

As pointed out in the majority opinion, there is no evidence in the record to demonstrate that the first publication was made with actual malice—that the defendants entertained serious doubts as to the truth of the publication or that they had a high degree of awareness of probable falsity. To the contrary, defendant Nash testified that he published the first article believing it to be true.

The state of mind of the defendants *prior to publication* is the subject with which this court must be concerned. As stated by the Oklahoma Supreme Court in *Jurkowski v. Crawley,* 637 P.2d at 61–62 (quoting *St. Amant v. Thompson* ) (emphasis added; footnotes omitted):

> " '[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth ...'
> "The above quotation illustrates the indispensability of the requirement that the defendant *in fact* entertain serious doubt when showing actual malice through reckless disregard for the truth. The essence of the requirement would seem to stem from the disability of the government under the First Amendment to interfere with the judgment of a publisher; thus unless there is evidence of 'guilty knowledge' of the falsehood, in fact, laid at the publisher's feet prior to

publication, recovery would have a chilling effect on the First Amendment.... It is proof of the guilty knowledge *prior to publication* that demonstrates the First Amendment immunity does not apply; nothing more is required to escape defendant's summary judgment and nothing less is permitted."

The *Jurkowski* court noted that the record was totally barren of evidentiary material disclosing that the defendants were aware of the probable falsity of their statements. The record before us, like that before the court in *Jurkowski,* is absolutely devoid of any evidence to establish actual malice before the first publication. In this respect, I must dissent from the majority.

However, where the plaintiff pleads malice and a reckless disregard for the truth and conflicting inferences and conclusions may be drawn from the evidence, a substantial controversy exists rendering summary judgment inappropriate. *Johnston v. Corinthian Television Corp.,* 583 P.2d at 1104.

Reasonable conclusions to be drawn from Luper's evidence tend to show that at least some of the defendants had serious doubts as to the truth of the statements before the second publication was made. The statements by defendant Sanford that he ordered defendant Nash to refrain from publishing further statements about Luper would seem to be sufficient to withstand a motion for summary judgment. Certainly one reasonable inference to be derived from defendant Nash's acts could be that he acted with "a high degree of awareness of probable falsity."

As the Court stated in *St. Amant v. Thompson,* 390 U.S. at 732, 88 S.Ct. at 1326:

> "The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will

they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

Although a public official or public figure has a higher standard of proof in a defamation action, whether the defendants here acted in reckless disregard of the truth in publishing further defamatory statements should be a decision for the trier of fact.

There is evidence in the record that a trier of fact could find, regarding the second publication, that the defendants had a high degree of awareness of probable falsity. Thus, there is a substantial controversy as to a material fact regarding the second publication only and summary judgment in that regard was inappropriate.