**CASTLE CAPITAL CORPORATION, Appellant,**

v.

**ARTHUR YOUNG & COMPANY and James L. Houghton, Appellees.**

No. 58625.

Court of Appeals of Oklahoma, Division No. 2.

May 29, 1984.

Released for Publication by Order of Court of Appeals June 29, 1984.

James M. Peters, Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, for appellant.

Harry A. Woods, Jr., Brooke S. Murphy, Crowe & Dunlevy, Oklahoma City, John Matson, New York City, for appellees.

MEANS, Presiding Judge.

Castle Capital appeals from the trial court's sustainment of summary judgment for defendants Arthur Young and Company and James Houghton. Concerning these defendants, the trial court found no substantial controversy as to any material fact. Having reviewed the record and applicable law, we affirm.

Early in 1972 William Bradford, a Ponca City oilman and geologist who is now deceased, sought to form a series of partner-

ships for oil and gas ventures. Bradford owned the controlling interests in both Pioneer Petroleum, Inc., and Frontier Corporation.

Bradford organized a drilling program which was designed to provide substantial federal income tax deductions by using a two-tier partnership structure. Investors would purchase interests in an initial partnership which would use that capital to explore and develop one of Pioneer's oil and gas leaseholds. If the development proved successful, the partnership would sell to an outside lender, such as a bank, a carved out production payment (COPP).[1] The proceeds from that COPP transaction would then be used to fund a second drilling partnership. Thus, a single investment would provide two sets of tax deductions for intangible drilling costs.

Under Bradford's scheme the first partnership known as E–72 would be formed with Bradford as a sole general partner. Limited partnership units would be sold to investors and each cash investor would become a limited partner. In purchasing the limited partnership units, the limited partners would contribute all of the capital of E–72, or $800,000. Bradford as a general partner would have no interest in the profits, losses, or capital of E–72.

Using its $800,000 in capital investments, E–72 would purchase from Pioneer a 50 percent working interest in one of Pioneer's oil and gas leaseholds. E–72 would contract with Pioneer for all work and equipment necessary to drill, develop and operate the leaseholds through December 31 of the contract year. In reality, Pioneer then contracted with Frontier for the actual operations.

The majority of the capital paid to Pioneer was allocated approximately as follows: 78 percent to intangible drilling costs; 10 percent to management fees;

1.24 percent to accounting, legal, and other expenses. These items were deductible on a pro rata basis for each limited partner provided that certain conditions were met. The rest of the capital was allocated for other nondeductible items. Potential investors were told that they would be able to realize a tax deduction as high as 180 percent of the amount invested.

When the leasehold had been developed enough to establish that it had economic value, Bradford would make further arrangements for other development of the leaseholds. This was accomplished by selling a carved out production payment to an outside lending source for approximately $800,000, payable out of 100 percent of the net revenues resulting from developing the leasehold in E–72. This sale of the COPP to an outside lending source, such as a bank, would be analogous to a non-recourse mortgage for tax purposes. The purchase price of the COPP, plus the agreed interest would be recovered by the outside lending institution only from the revenues generated by production from the working interest. Bradford told investors that a COPP loan would be available to E–72 from Fidelity Bank. Fidelity's president, Grady Harris, made the same assurances.

Once the COPP loan was acquired, Bradford would form a second limited partnership, F–72, with Bradford as the general partner and the same limited partners as E–72. The limited partners of E–72 would receive a distribution of all the funds acquired from the COPP loan. These funds would immediately be invested in F–72. Thus, the capital of F–72 would be supplied entirely from the funds acquired from the COPP loan obtained from an outside lending source. F–72 would then enter into an agreement with Pioneer to develop a second leasehold in the same manner as the

---

**1.** A carved out production payment is created when the owner of a mineral property, such as an oil or gas well, assigns a right to a specified share of the production from minerals in place or the proceeds from that production, if what is assigned has an expected economic life of shorter duration than the economic life of the miner-

al property upon which it is a burden. The purchaser of the production payment makes, in effect, a loan which is repayable solely out of future production from the mineral property. He has no recourse against the seller of the production payment.

E–72/Pioneer agreement. Under a valid COPP loan scheme, the investors would realize substantial federal income tax benefits.

In March 1972, Bradford contacted James Houghton, a partner in Arthur Young and Company and an expert in oil and gas taxation, for an opinion concerning the type of partnership which he had planned. Houghton responded with an opinion letter based totally on a hypothetical situation. The letter stated in part:

ABC, Ltd. is a limited partnership formed to engage in the acquisition, exploration and development of oil and natural gas properties in which P is the general partner. The limited partners are investors who have subscribed to limited partnership interests in ABC. It is proposed to expend the partnership funds in the prescribed manner and immediately thereafter liquidate the partnership by distributing the developed oil and gas properties to the partners in proportion to their partnership interest. Thereafter it is proposed that one or more of the limited partners will carveout for cash a production payment out of their fractional working interest to P or a related entity. You have stated that the price for the carved-out production payment will be determined in armslength negotiations. It is proposed that one or more of the investors will use the proceeds of the carved-out production payment to subscribe to a new limited partnership to be formed by P although the terms of the carve-out do not require such subscription, nor do the terms of the subscription require such carve-out.

It is assumed that the carved-out production payment qualifies as such in all respects, most particularly that is payable solely from production and no other source and that payout is reasonably certain at the time of assignment.

Based solely upon the foregoing facts, we are of the opinion that the carved-out production payment is required to be treated as a mortgage loan for all income tax purposes . . . .

Houghton's opinion letter, dated March 13, 1972, distinguished Revenue Ruling 72–135,[2] which was to be published later that same month. The letter did not contain any reservations or any cautions concerning this type of transaction.

Bradford then prepared a prospectus for the limited partnerships and sought investors for E–72. Bradford included Houghton's opinion letter in the prospectus and used Arthur Young and Company as a reference.

In his search to raise capital, Bradford contacted Castle Capital Corporation in New York. Castle contacted Houghton who assured it that carved out production payment loans were not uncommon and that the two largest banks in Oklahoma City routinely engaged in that type of loan transaction. Houghton stated that such loans were "garden variety" types of transactions and that Fidelity Bank, as the third largest bank in Oklahoma City, probably also engaged in COPP transactions.

Castle presented the prospectus to several investors and obtained investments of $635,000 from the law firm of Lazarow, Rettig, and Sundel (LRS) and $44,000 from Frederick Schwartzman. Schwartzman entered into a contract with Bradford and Pioneer for a limited partnership in E–72 on October 25, 1972. Because of certain reservations which the investors had, on October 26, 1972, LRS executed a buy back agreement with Pioneer and Bradford. By the terms of the agreement, Pioneer and Bradford agreed to buy back the investors' capital if a valid COPP loan was not obtained by December 1972. Castle executed a similar agreement, whereby it promised to buy back the investment capital if Bradford or Pioneer refused to do so. On the same day, Bradford, Pioneer and Castle sent an "inducement letter" to Schwartzman, assuring him of the buy back terms which they had promised to LRS. The next day LRS purchased limited partnership interests in E–72.

2. 1972–13 I.R.B. 16; originally released as T.I.R. 1146.

Fidelity Bank did acquire a production payment in the amount of $800,000 from the Bradford E–72 partnership on December 10, 1972. The investors were informed of this in a letter from Grady Harris, Fidelity's president. However, the investors were not informed that the production payment was subsequently assigned to Pioneer, Bradford's own company. Instead, the investors were led to believe that Fidelity still held the loan.

Subsequently, in 1975 the Internal Revenue Service audited the investors and found that a valid COPP loan had not been acquired and that the tax shelter was a sham. The investors made demands on Bradford's estate (he was now deceased) and Pioneer under the terms of the buy back agreement for return of their capital. When the estate and Pioneer refused to honor the agreement, the investors made demands on Castle Capital. Upon Castle's refusal to pay, LRS and Schwartzman sued Castle, Bradford's estate, and Pioneer for breach of contract in state court in New York.[3]

When Castle was sued, it filed a third party complaint in the New York court against Pioneer, Frontier, Bradford's estate, Fidelity Bank, John N. Burgher, Harris' estate, Arthur Young and Company, and Houghton. Among other things, Castle alleged that it was induced to enter the buy back agreement with the investors due to the fraud and misrepresentations of these parties. Castle alleged a conspiracy to commit fraud and sought to hold these parties liable for damages which Castle might have to pay if it lost in the suit brought by LRS and Schwartzman. Most of the third party defendants objected to the suit on jurisdictional grounds and almost all of them were dismissed from the New York lawsuit.

Shortly after Castle named the third party defendants to the suit in New York, it filed suit against these same defendants in Oklahoma. The petition is virtually the same as that presented in Castle's third party complaint in New York. Castle alleged a conspiracy to commit fraud and sought indemnification for any damages it might sustain in the New York lawsuit as well as punitive damages. Castle contended that all the defendants knew the COPP loan was a sham and that each defendant stood to gain a substantial amount of money through the alleged fraud.

All defendants demurred to the Oklahoma action. The trial court sustained the demurrers and found that the petition did not state facts sufficient to constitute a cause of action against any of the defendants, that the cause of action was barred by the Oklahoma statute of limitations and that the action was premature in that Castle had not yet sustained any damages. Castle then filed an amended petition which is nearly identical to the first petition. Some of the defendants filed demurrers to this petition also. Defendants Arthur Young and Houghton entered motions for summary judgment, contending that there was no substantial controversy as to any material fact. The trial court agreed and granted summary judgment as to these two defendants. Castle has appealed.

Castle's brief begins by warning the court that this action concerns a "complex factual situation dealing with a sophisticated oil and gas transaction." Perhaps Castle's tactic is to convince this court that such a "complex factual situation" must without a doubt have some sort of factual controversy which would preclude summary judgment. What Castle has failed to do however, is to point out even one factual controversy which would preclude summary judgment.

3. Of interest are two other lawsuits which involve basically the same parties. The investors have challenged the IRS ruling in a lawsuit in federal court. The investors also brought a class action for violation of securities laws and fraud in federal court against Pioneer, Frontier, Bradford's estate, Fidelity Bank, John Burgher, Harris' estate, Arthur Young and Company, Houghton, and Walker, Lawrence & Walker. This suit was filed in federal court in New York, but was transferred to the Western District of Oklahoma. Castle Capital is not a party to that lawsuit.

District Court Rule 13(a), 12 O.S.1981, ch. 2, app., provides in part:

A party may move for judgment in his favor on the ground that the depositions, *admissions* in the pleadings, stipulations, answers to interrogatories and demands to admit, affidavits, and exhibits on file, filed with his motion or subsequently filed with leave of court show that there is no substantial controversy as to any material fact. (emphasis added)

A motion for summary judgment may be properly sustained only if no question concerning any material fact remains to be determined. *Garner v. Johnson,* 609 P.2d 760, 762–63 (Okla.1980). The court's ruling on a motion for summary judgment must be made on the record which the parties have actually presented and not on a record which is potentially possible. *Northrip v. Montgomery Ward & Co.,* 529 P.2d 489, 494 (Okla.1974).

On review to this court, all inferences and conclusions to be drawn from the underlying facts in the record presented below should be viewed in the light most favorable to the party opposing the motion. *Rose v. Sapulpa Rural Water Co.,* 631 P.2d 752, 754 (Okla.1981). This court will examine the pleadings and evidentiary materials to. determine what facts are material, and whether the evidentiary materials show that no substantial controversy exists as to any material fact. *Weaver v. Pryor Jeffersonian,* 569 P.2d 967, 973 (Okla. 1977).

In the instant case, Castle has alleged that Arthur Young and Houghton were part of a conspiracy to misrepresent the Bradford partnerships and that such acts resulted in a fraud on Castle and the investors. Castle alleges that without the opinion letter attached to the Bradford partnership prospectus, the reference of Arthur Young, and assurances that COPP loans were "garden variety" transactions, Castle would not have become actively involved. Castle states that Houghton and Arthur Young knew of Bradford's scheme and knew that the scheme needed the prestige of a nationally respected accounting firm.

Castle did not accuse Arthur Young and Houghton of negligence, nor did it make allegations that the opinion letter was an incorrect statement of the law as it related to carved out production payments. Castle states that Houghton should have included a reservation in the opinion letter warning of the risks of this type of venture, but cites no authority on which to base this claim.

In determining whether the summary judgment was proper the court must first look at the elements of Castle's cause of action. Castle has accused Arthur Young and Houghton of fraud, deceit, and conspiracy. The elements of fraud were stated in *D & H Company, Inc. v. Shultz,* 579 P.2d 821, 824 (Okla.1978), as:

In this jurisdiction, the elements of actionable fraud are that the defendant made a material misrepresentation that was false, that he knew when he made the representation that it was false, or that it was made recklessly without any knowledge of its truth and made as a positive assertion, and that he made it with the intention that it should be acted upon by plaintiff, and that plaintiff acted in reliance upon it and thereby suffered injury.

In the instant case, Castle has not alleged that the opinion letter issued by Houghton was in any way false. However, Castle states that Houghton should have included a reservation in the letter, and a reference to the revenue ruling. On its face the letter purports to be nothing more than an opinion based on a hypothetical. It does not contain any statement which is either false or unclear. Furthermore, Houghton did make reference to the revenue ruling and distinguished it from the hypothetical given him by Bradford.

Castle also seeks to establish liability for Arthur Young and Houghton based on assurances in a telephone conversation that the carved out production payment loan was a routine transaction for outside lending sources, such as banks. However, this statement is absolutely true. Large banks often engage in this type of transaction.

Furthermore, both parties to the conversation are in basic agreement as to what was said. Richard Stone, an accountant representing Castle in these conversations, testified in his deposition: "I don't think [Houghton] told me that Fidelity would make a loan, either one way or another." Stone agreed that a fair summary of the conversation would be "that what Mr. Houghton baiscally [*sic*] conveyed to [Stone] in that conversation was that it was very common for banks in that area to make COPP loans on water flood projects."

Because there is no disagreement as to the contents of the communications between Arthur Young and Castle, and those communications are not demonstrated to be false, Castle must present some sort of evidentiary material in order to tie Arthur Young and Houghton to the alleged conspiracy. Liability must be founded on false statements made by Bradford in the prospectus and in communications with Castle.

Attached to the motion for summary judgment submitted by Arthur Young and Houghton, is an affidavit by Houghton. Houghton states that he had no contact with Bradford except to write the opinion letter, and that he had no knowledge of any conspiracy or fraud. In fact, Houghton notes that Arthur Young refused to work for Bradford, Pioneer, and Frontier shortly after the opinion letter was issued because the companies wanted Arthur Young to file improper allocations of expenses for tax returns. Houghton admits that he talked with Castle and told it that COPP loans were not unusual and that funding from a bank such as Fidelity was very possible. Houghton's affidavit is based on his personal knowledge and is specific as to dates, numbers, and places.

Attached to their reply memorandum in support of their motion for summary judgment, Arthur Young and Houghton included portions of deposition testimony from Houghton, Richard Stone, and Vincent Erichs, a Castle officer. Nothing in any of this testimony presents a substantial controversy. In fact, Erichs' deposition testimony totally supports the opinion letter issued by Houghton. Concerning the partnership arrangement and COPP loan as outlined by Bradford in the prospectus, Erichs stated:

My basic feeling of comfort with it, in that it was right within 636, that it presented very little tax risk, that it was outside of Revenue Ruling 72–135, and that if a bank were willing to loan $800,000 predicated upon half the production, that they ought to find the same sense of comfort in an $800,000 investment. I mean, that was my basic feeling on it.

If the bank would loan $800,000 secured by one half the production and the other half of the production was going to the investors, that bank loan, if it were uncollateralized by any other source, would be an independent verification to the investors that he should get his $800,000 back.

That, combined with the tax benefits of a 1.3 write-off, tax favored depletion on their production income—and back in 1972, I don't think this was a preference, either—it made for a pretty good economic and tax investment.

This parallels Houghton's opinion letter based on the hypothetical and in no way contradicts the statements presented by Houghton and Arthur Young.

In Castle's opposition to the motion for summary judgment, it cited the following, which we have examined in a light most favorable to Castle.

1. Its amended petition.

2. Its answers and supplemental answers to interrogatories. However, these answers are of little value. Many are incomplete and almost every answer states what Castle "contends" or "believes" to have happened. The answers basically repeat the allegations in the petition.

3. An affidavit by Richard Egge, president of Penn-Dixie Leasing, the successor to Castle. Egge stated that his affidavit was "made on personal knowledge gained as a result of my review of Castle's files and of documents and deposition testimony." Egge's affidavit does

not in any way contradict that of Houghton. Egge does not provide any more of a connection between Houghton and Arthur Young and the alleged conspiracy than does the petition.

4. An affidavit by Bonnie Kayatta-Steingart. Once again, this affidavit was made on Steingart's knowledge after examining the pleadings and files, not on her personal knowledge. This affidavit also fails to contradict any statement made by Houghton. Neither affidavit provides anything more than the pleadings in answering how Arthur Young and Houghton defrauded Castle.

Although the following materials were not cited in Castle's opposition to the motion for summary judgment, they are included in the record as attachments to the two affidavits submitted by Castle and have been examined by this court.

5. Bradford's confidential memorandum describing the limited partnerships. This contains a copy of the opinion letter written by Houghton and also lists Arthur Young and Company as a reference. However, the memorandum gives seven other prominent individuals and corporations as references yet Castle did not sue any of the other references.

6. A copy of an article by Kenneth Miller from *Miller's Oil and Gas Federal Income Taxation*. The article refers to requirements for nonassociation status of limited partnerships having a sole corporate general partner. Published in the summer of 1972, the article gives certain problems which can occur in restructuring production payments. However, none of the situations described mirrors that of the Bradford partnerships.

7. Letters to Castle from Bradford and Harris concerning the COPP loan. Once again, these letters provide absolutely no link between an alleged conspiracy and Arthur Young or Houghton.

8. Copies of the loans executed between Bradford and Fidelity Bank. These provide no controversy as to Ar-

thur Young's or Houghton's involvement.

9. Copies of pleadings and orders filed in the New York lawsuit and in the class action suit in the Western District of Oklahoma. These are not evidentiary materials and many of the orders concern parties which are not present in this lawsuit.

10. A June 1972 letter from John Creed of Baker & McKenzie in New York, challenging the advisability and correctness of some of the statements in Bradford's confidential memorandum. Creed particularly warned of the difficulties involved when a carved out production payment was created in favor of a general partner. Creed also challenged the statement guaranteeing a 180 percent deduction of investor's capital. However, nothing in Creed's letter states that Houghton's opinion letter was false or misleading. Presumably, Castle would have us believe that because Creed had reservations about Bradford's plan, that Houghton should have also had these reservations and included them in his opinion letter.

11. Rev.Rul. 72–135, 1972–13 I.R.B. 16. This ruling is based on a factual situation different from that in Houghton's opinion letter. Houghton distinguished the ruling in his opinion letter. Nowhere has Castle stated why Houghton's opinion letter is wrong or misleading or stated which language the court could use to hold Houghton and Arthur Young liable.

12. A portion of Erichs' deposition. Once again, Erichs' testimony does not in any way show a substantial controversy.

As Houghton correctly points out, a "[m]ere contention that facts exist or might exist is not sufficient to withstand summary judgment." *Loper v. Austin*, 596 P.2d 544, 546 (Okla.1979). As Houghton also points out, the party opposing the motion for summary judgment "has the burden of showing that evidence is available which would justify a trial of the issue." *Ru-*

*nyon v. Reid,* 510 P.2d 943, 946 (Okla. 1973).

Castle has failed to provide any evidentiary material which supports a link between the involvement admitted by Houghton and Arthur Young and the alleged conspiracy involving Bradford, Harris, Fidelity Bank, and Bradford's companies. Furthermore, the affidavits which Castle seeks to use to establish a factual controversy do not meet the requirements for affidavits under Oklahoma law. District Court Rule 13(c), 12 O.S.1981, ch. 2, app., provides:

> The affidavits that are filed by either party shall be made on *personal knowledge,* shall show that the affiant is competent to testify as to the matters stated therein, and shall set forth matters that are admissible in evidence. (emphasis added).

The affidavits submitted by Castle fail to meet any of the requirements of Rule 13. They are not made on personal knowledge, not made by persons competent to testify, nor do they contain statements which are admissible in evidence. Nothing in the evidentiary materials presented by Castle in opposition to the motion for summary judgment presents a substantial controversy as to any material fact.

It is difficult to isolate what factual questions Castle contends are at issue. However, it appears to be asserting that the important role played by Arthur Young and Houghton in rendering a tax opinion for use in Bradford's prospectus, and representing to Castle the common availability of an outsider's acquisition of the carved out production payment precludes summary judgment.

No one has ever questioned the basic structure of the transaction as reflected in the Bradford prospectus. Castle's claim really is that the plan was not followed. Houghton's opinion letter is a correct statement of the law as applied to the hypothetical which Houghton was given. Houghton distinguished Revenue Ruling 72–135 on factual grounds. There is nothing in the record presented before this court to even remotely connect Houghton and Arthur Young with Bradford's conduct. Castle has presented absolutely no evidentiary material in opposition to the motion for summary judgment which contradicts what Houghton has stated. The order sustaining the motion for summary judgment is affirmed.

BACON, J., and DeMIER, J. (sitting by designation), concur.